Eugene E. PETERSEN, an Individual, and Petersen Tool Co., a Nebraska Corporation, Plaintiffs,

v.

FEE INTERNATIONAL, LTD., and H. J. Flewelling and Resco, Ltd., Defendants,

Mitsubishi International Corp., Respondent.

Civ. No. 72–181.

United States District Court, W. D. Oklahoma.

Dec. 4, 1975.

John B. Hayes, Oklahoma City, Okl., John E. Reilly, James R. Young, Denver, Colo., for plaintiffs.

Jerry J. Dunlap, Robert M. Hessin, William B. Rogers, Claude S. Woody, Jr., Oklahoma City, Okl., for all defendants.

Philip T. Shannon, New York City, Fellers, Snider, Baggett, Blankenship & Bailey, Oklahoma City, Okl., for respondent.

## ORDER

DAUGHERTY, Chief Judge.

Plaintiffs sued Fee International, Ltd., Resco, Ltd. and Harry J. Flewelling for patent infringement, false marking and unfair competition. A non-jury trial was conducted and on March 29, 1974 the Court found Plaintiffs to be the owners of U. S. Patent No. 3,555,939 (939); that '939 is a valid patent; that Defendants' "Quali-Kraft" FD–800 wrench infringes '939; that Defendants were guilty of false marking; and that Defendants were guilty of unfair competition. The Court also found that Plaintiffs were entitled to a permanent injunction against the Defendants, their officers, agents, employees, and those in privity with them, against further infringement, further false marking, and against further unfair competition. On April 8, 1974 a Fi-

nal Judgment and Order, prepared and approved by the parties, was entered herein. That Judgment and Order reads in part as follows:

"(A) permanent injunction is hereby issued and entered enjoining and restraining the defendants, Fee International, Ltd., Resco, Ltd., and Harry J. Flewelling, their officers, agents, employees, and those in privity with them and each of them, directly or indirectly from using or causing to be used the product described in Letters Patent No. 3,555,939 and in claims 1 through 5 thereof, and from otherwise infringing said Letters Patent."

Prior to the infringement suit Defendants had entered into various contracts relating to the distribution and sale of the "Quali-Kraft" FD-800 wrench (FD-800) with Respondent, the Mitsubishi International Corporation (Mitsubishi). Subsequent to the entry of the April 8, 1974 permanent injunction Respondent continued to sell FD-800s. On January 20, 1975 Plaintiffs filed herein a Motion for Contempt seeking to hold Defendants and Respondent in contempt for Respondent's sales of infringing wrenches. An evidentiary hearing on Plaintiffs' Motion has been conducted. The Defendants and Respondent were present by counsel and personal representatives. After the close of Plaintiffs' evidence Defendants and Respondent moved for judgments of acquittal or that the Motion for Contempt be denied. The Court took these Motions under advisement and upon due consideration finds and concludes that the Motion for Contempt should be denied.

It is Plaintiffs' contention that Respondent is bound by the April 8, 1974 permanent injunction and is in contempt of this Court for selling FD-800s in violation of the terms thereof for the following reasons: Respondent received actual notice of the injunction shortly after its entry; Respondent is in privity with Defendants; Respondent has aided and abetted Defendants in the sale of FD-800s; Defendants agreed to indemnify Respondent against the results

of this litigation; and Respondent failed to intervene in the infringement litigation. Plaintiffs contend that Defendants have violated the April 8, 1974 permanent injunction for these reasons: Defendants failed to cancel their contracts with Respondent; Defendants failed to take affirmative action to keep Respondent from selling FD-800s; Defendants have aided and abetted Respondent in violations of the injunction; and Defendants have sought to profit from Respondent's violations.

In response Respondent asserts that it is not in contempt as it is not in privity with Defendants; its contracts with Defendants were void in their inception as they were induced by fraud; it has acted completely independently of Defendants since April 8, 1974; Plaintiffs have already collected damages for the sale of more FD-800s than it has sold since the entry of the injunction; and it cannot be held in contempt as Defendants have committed no act of contempt. In response Defendants assert that they have sold no FD-800s since April 8, 1974 and that even if they had they could not be held in contempt as Plaintiffs after the Judgment herein on April 8, 1974 granted them license to sell FD-800s.

The facts developed at the evidentiary hearing are as follows: Respondent first learned of Defendants in August 1972 when Defendant Flewelling contacted it at its New York office. Respondent was interested in marketing Defendants' "Quali-Kraft" line of tools. Negotiations were conducted and on March 28, 1973 Defendants and Respondent entered into three contracts expressing their agreement, a licensing agreement, a security agreement, and a personal guaranty. In the licensing agreement Fee granted Respondent the right to sell "Quali-Kraft" tools in all countries except the United States, Canada, and Mexico. Respondent agreed to pay Fee 5% of its gross sales as consideration for the license. Respondent also agreed to finance the purchase by Fee of merchandise, including the "Quali-Kraft" line of tools, for sale in the United States, Canada and Mexico. The security agreement granted Respondent a

security interest in all inventory and proceeds which it financed. In the personal guaranty Flewelling personally guaranteed Fee's debt to the Respondent. On August 31, 1973 the March 28, 1973 license agreement was modified by a letter contract to grant Respondent the exclusive right to sell the FD–800 wrench. In this contract Fee also agreed to hold Respondent harmless from the results of any adverse decision in the pending litigation. Respondent did not take over Defendants' distributors after entering into this contract.

In May, 1973 Respondent purchased 50,000 FD–800s from Fee. These wrenches had previously been imported by Fee independently of Respondent. These wrenches were stored by Fee in its Oklahoma City warehouse and Respondent paid Defendants for the same and took delivery in September 1973. In August, 1973 Respondent imported 120,000 FD–800s from Japan. At some time prior to April 8, 1974 Fee, under pressure from the Japanese manufacturer, agreed to purchase 67,000 FD–800s. As Fee lacked the necessary funds it borrowed the requisite amount from Respondent on a 120 day loan secured by the shipment. These 67,000 wrenches were brought into the United States and placed in a custom's bonded warehouse in Seattle, Washington. Fee defaulted on its loan and Respondent took possession of the wrenches. The default and repossession by Respondent took place before April 8, 1974; however, the entire foreclosure procedure was not completed until thereafter. Respondent had full control and equitable title to these wrenches before the injunction against the Defendants was entered herein.

On May 15, 1974 Plaintiffs and Defendants entered into a settlement agreement adjusting their respective rights under the Court's Final Judgment and Order of April 8, 1974. Defendants agreed to cease and desist from making, selling, or using infringing wrenches, from all acts of unfair competition, and from false marking. Defendants granted Plaintiffs the right to use the "Quali-Kraft" trade name and Plaintiffs agreed to reach an agreement with Respondent within 180 days concerning the disposition of Respondent's stock of FD–800 wrenches. Fee also agreed to deliver to Plaintiffs its entire stock of FD–800s. Ultimately Fee delivered to Plaintiffs more than 51,000 wrenches pursuant to this agreement. Plaintiffs were unable to reach an agreement with Respondent. On September 17, 1974 Plaintiffs granted Fee exclusive license, for a period of six months, to sell 300,000 FD–800 wrenches. The purpose of this agreement was to allow Defendants to acquire and sell Respondent's stock of FD–800s. No purchases were ever made under this agreement.

Plaintiffs presented no evidence that Defendants have violated the Judgment entered herein by selling any FD–800 wrenches since April 8, 1974. The evidence revealed that Respondent has sold less than 50,000 FD–800s since April 8, 1974, but it has offered to sell more than 200,000 FD–800 wrenches. There was no evidence presented which showed that Respondent has paid Defendants any commission or royalty on its sales of approximately 36,000 FD–800s since April 8, 1974. The evidence does show that Respondent learned of the injunction shortly after it was entered.

■ Rule 65, Federal Rules of Civil Procedure states that:

"Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise."

Rule 65, *supra,* is derived from the common law doctrine that a decree of injunction not only binds parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Regal Knitwear Co. v. National Lab. Rel. Bd.,* 324 U.S. 9, 65 S.Ct. 487, 89 L.Ed. 661 (1945). The essence of the doctrine is that defendants may not nullify a decree by carrying out prohibited acts

through aiders and abettors although they were not parties to the original action. *Regal Knitwear Co. v. National Lab. Rel. Bd., supra.* In the older cases a decree of injunction was generally directed to the party defendant, his officers, agents, servants and employees. The object of this generalization was to prevent defendants from doing by others that which the Court had forbidden them to do personally; from accomplishing indirectly a result prohibited by the Court. The full effect of such an order was that the defendant shall not do the prohibited act himself, neither shall his agent, servant, or employees do it for him, nor shall the defendant do it as the agent, servant, or employee of another. *Dadirrian v. Gullian,* 79 F. 784 (D.N.J.1897).

█ Rule 65, *supra,* does not add or detract the range of persons that were bound by a decree of injunction under basic equity practice and due process principles that were applied to the equity side of the federal courts prior to 1938. 11 Federal Practice and Procedure, Wright and Miller, 2956. Under the common law there were two basic situations in which a person not named in a decree of injunction could be held in contempt for violations of the terms thereof. The first was when the person not named was legally identified with the named defendant, and the second was when the unnamed person aided or abetted the named person in the performance of a prohibited act. The reason for this rule was:

". . . no court can make a decree which will bind anyone but a party; a court of equity is as much so bound as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful. Its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person not a party may be punished is when he has helped to bring about, not merely what the decree has forbidden, because it may

have gone too far, but what it has the power to forbid, an act of a party. This means the respondent must abet the party or be legally identified with him." *Alemite Mfg. Corporation v. Staff,* 42 F.2d 832 (Second Cir. 1930).

█ Although Rule 65, *supra,* makes no mention of it, the word "privity" is often used as a synonym for the persons mentioned in Rule 65 as being "their officers, agents, servants, employees and attorneys" and "in active concert or participation." See 11 Federal Practice and Procedure, Wright and Miller, 2956. This is unfortunate because "privity" is a word with many meanings and only some of these meanings express the relationship which must exist between a defendant and a third party if the third party is to be held in contempt for doing the act which the defendant is prohibited to do. In its broadest sense "privity" is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. 72 C.J.S. p. 954. The meaning attached to the word "privity" in its use as a synonym for the parties described in Rule 65 is the latter relationship, such an identification of interest of one person with another as to represent the same legal right and generally not the first relationship. However, in one limited instance, the sale of an ongoing business, "privity" as used in the context of Rule 65 can mean successive relations to the same right of property.

In *Blatz v. The Fair,* 178 F.Supp. 691 (N.D.Ill.1959) the Court very clearly expressed the required "privity" relationship:

"All persons who are in privity with parties to the litigation or who aid and abet such parties in disobeying the injunction are guilty of contempt of court if they have knowledge of the injunction although they are not named in the order granting the injunction or are not themselves parties to suit. Privity involves a person so identified in interest with another as to represent the same legal rights and who is therefore bound by the

judgment adjudging such rights. Conversely, persons who are not parties to the injunction or in privity with them and whose rights have not been adjudicated therein are not bound by the decree in so far as it operates in personam and cannot be held liable for acts done contrary to its terms. Privity is not established merely because persons are interested in the same question or in proving the same set of facts or because the question litigated is one which might affect such other person's liability as a judicial precedent in a subsequent action."

The facts of the *Blatz* case are illustrative. The Fair, a retailer, sold hobby horses manufactured by Rich. Blatz brought an infringement action. Rich's product was found to infringe Blatz's patent. An injunction restraining the sale of Rich's product was issued against both Rich and The Fair. Subsequently The Fair sold an identical product manufactured by DeLux and Gong Bell. Blatz filed a complaint seeking to hold DeLux, Gong Bell and The Fair in contempt. The court found that there was not such an identification of interest between the parties to the first suit and the parties to the second suit as to represent the same legal right.

A more helpful case is *United Pharmacal Corporation v. United States*, 306 F.2d 515 (First Cir. 1962). The Government obtained an injunction against Metabolic restraining the sale of a specific drug. Prior to the issuance of the injunction Metabolic had entered into a contract with United granting United license to sell the drug in the United States. United agreed to purchase its supply from Metabolic. unless Metabolic could not supply it in which case United was free to purchase elsewhere. Consideration for the license was 30 percent ownership in United. After the injunction had been entered an agent of the United States obtained a bottle of the drug from United. The Government then brought contempt proceedings against United. The District Court granted the Government's motion but the Circuit Court reversed finding that Metabolic had not used United as its instrumentality to sell the drug and that United

had acted wholly separately and independently of Metabolic. In this case there was a mutual relationship between Metabolic and United to the same right of property, the drug. The mutual relationship had been derived through a contract which might be described as a successive relationship as to the same right of property. Thus privity between the defendant and respondent existed in two manners, and neither alone, nor both together, was found to be sufficient to bind the respondent to the terms of the injunction restraining the defendant. There was not such an identification of interest between the defendant and respondent to represent the same legal right.

■ Plaintiffs herein urge that privity of contract is a sufficient basis for holding Mitsubishi in contempt. The evidence clearly establishes privity of contract between Defendants and Mitsubishi. Mitsubishi purchased 50,000 FD–800 wrenches from Defendants. This is a successive relationship to the same right of property. Defendants' grant of license to Mitsubishi is in a sense mutual relationship to the same right of property; for, even though Defendants did not have the right to license Mitsubishi, Defendants claimed ownership of '939 and Mitsubishi's claim was derived therefrom. Thus privity exists between Defendants and Mitsubishi in the sense of mutual or successive right of ownership to the same right of property. This is, however, in and of itself insufficient to create liability for contempt on the part of Mitsubishi. As is clearly stated in *Alemite Mfg. Corporation v. Staff, supra,* and *Blatz v. The Fair, supra,* the degree of privity required to bind a respondent to the terms of a decree of injunction in which he is not named as a party is that the named defendant and respondent be so identified in interest as to represent the same legal right. This is because the non-party is entitled to his day in court. Thus, if the non-party is to be held bound, the appearance of the party in court must be tantamount to the appearance of the non-party as well. In this case it can hardly be said that the Defendants'

appearance in this court in the infringement action is tantamount to the appearance of Mitsubishi. The evidence before the Court indicates that Mitsubishi and the Defendants were and are distinct entities involved in arms length transactions. The Court cannot hold that Defendants and Mitsubishi were so identified in interest as to represent the same legal rights.

There appears to be one exception to the rule that the word privity as it is used in the context of Rule 65 means such an identity of interest between the parties as to represent the same legal right. This exception is that where an ongoing business against which litigation is pending or against which a decree of injunction has been entered is acquired by a third party the acquiring party is bound by the terms of the injunction or the outcome of the litigation. *Golden State Bottling Co. v. NLRB, supra; Brunswick Corporation v. Chrysler Corporation,* 408 F.2d 335 (Seventh Cir. 1969); *J. R. Clark Co. v. Jones & Laughlin Steel Corp.,* 288 F.2d 279 (Seventh Cir. 1961). This is because persons acquiring an interest in property which is the subject of litigation are bound by a subsequent judgment. This point is, however, not present in this case under the evidence before the Court.

As under the evidence presented Mitsubishi is not Defendants' officer, agent, servant, employee, or attorney, and has not been in active concert or participation (privity) with Defendants for purposes of contempt it cannot be held in contempt. The Plaintiffs have totally failed in their proof as to both the Defendants and Mitsubishi. There is no evidence that Mitsubishi and Defendants have done anything together since the entry of the permanent injunction. Plaintiffs have not shown that Mitsubishi has paid Defendants any royalty or commission on its sales of FD–800 wrenches after the entry of the injunction or that Defendants have in any way benefited from these sales. The active concert and participation language of Rule 65 clearly is derived from the common law aiding and abetting concept. As Plaintiffs have not shown that Defendants have done anything to make them in contempt of Court, it is not possible for Mitsubishi to be guilty of aiding and abetting the Defendants. Moreover, as Plaintiffs have settled with Defendants for their sales of infringing wrenches made prior to April 8, 1974 and have thereby cleansed all such sales, and as Mitsubishi on April 8, 1974 had at least 50,000 infringing wrenches (those it bought from Defendants and paid for and took delivery prior to April 8, 1974) which had been so cleansed it could sell this number of FD–800 wrenches without any complaint from Plaintiffs. The evidence showed sales from April 8, 1974 to date by Mitsubishi of only approximately 36,000 FD–800 wrenches.

Accordingly, Defendants' and Respondent's Motions for Judgment of acquittal should be granted and Plaintiffs' Motion for Contempt as to them should be denied.

It is so ordered this 4th day of December, 1975.