In re 815 WALNUT ASSOCIATES, a Pennsylvania limited partnership, Debtor.

In re BEN FRANKLIN HOTEL ASSOCIATES, a Pennsylvania limited partnership, Debtor.

BEN FRANKLIN HOTEL ASSOCIATES, a Pennsylvania limited partnership, CAA/Kennington Properties, a California Partnership, Plaintiffs,

v.

Alfred A. GILBERT, Defendant.

Alfred A. GILBERT, Third Party Plaintiff,

v.

ALTMAN BROTHERS, INC., Margery Altman, Rebecca Kohn, David Altman, Irving Altman, Albert Eisen, Gerhard Klenk, George Wolfman, and Ruth Wolfman.

Bankruptcy Nos. 93–17089 SR, 93–17088 SR. Adv. No. 95–0013.

United States Bankruptcy Court, E.D. Pennsylvania.

June 26, 1995.

James Griffith Jr., Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA.

Steven M. Coren, Peter J. Leyh, Kaufman, Coren, Ress, Weidman & Silverang, Philadelphia, PA.

Frederic J. Baker, Asst. U.S. Trustee, Office of the U.S. Trustee, Philadelphia, PA.

C. Paul Scheuritzel, Doron A. Henkin, Toll, Ebby, Langer & Marvin, Philadelphia, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Before the Court is yet another Motion in this contentious adversary proceeding between Ben Franklin Hotel Associates (the "Debtor") and one of its two general partners, CAA/Kennington Properties ("Kennington"), on the one hand (collectively the "Movants") and unsecured claimant Alfred A. Gilbert ("Gilbert"), on the other hand. At bottom, the underlying litigation involves Gilbert's claim of entitlement to a share of a certain fee payable by the Debtor under the terms of a construction contract. The instant Motion seeks 1) an Order judicially estopping Gilbert from asserting positions in this litigation contrary to positions which the Debtor and Kennington assert were taken by Gilbert in a 1987 District Court litigation, and 2) an Order both compelling Gilbert to provide supplemental responses to interrogatory answers and imposing sanctions against Gilbert in connection with his initial, allegedly deficient, discovery responses. Oral argument was held June 1, 1995, and both matters have been extensively briefed by the parties. For the reasons hereinafter discussed, the Movants' request relative to judi-

cial estoppel will be granted. This disposition, from the Court's perspective, will likely render moot many of the pending disputes between the parties with respect to discovery, and in fact portends disposition of the substantive claim at issue. Accordingly, rather than disposing of the discovery issues herein, the Court will reserve them for the time being and hold a supplemental pre-trial conference to consider the future course of this litigation.

### Background

Certain factual background relevant to the parties' dispute is by now well familiar to the Court. It has been detailed in several previous opinions and is again, for convenience, repeated here:

The Debtor is a Pennsylvania Limited Partnership formed to own, refurbish and develop the Ben Franklin Hotel, a well known landmark located at the corner of 9th and Chestnut Streets in Philadelphia, Pennsylvania. In October of 1984, the Debtor entered into a written agreement with Altman Bros, Inc. ("ABI") for extensive renovation work at the Hotel property. (the "Contractor Agreement.") Subject, of course, to many terms and conditions set forth in its text, the Contractor Agreement provided for payment of a substantial fee (the "Contractor Fee") by the Debtor to ABI. On the same date as the Contractor Agreement was executed, ABI entered into a separate written agreement (the "Indemnity Agreement") with the Claimant Gilbert, and others, which agreement created various obligations of indemnity for certain of the parties thereto, vis a vis, the Contractor Agreement. The Indemnity Agreement further provided for payment of the Contractor Fee over to the indemnitors as and when the same was collected from the Owner (i.e, the Debtor) by the Contractor, ABI.

The Contractor Fee was never paid by the Debtor to ABI and the Debtor maintains that none is owed. In this regard, the Debtor's Summary Judgment Motion has appended to it a 1993 Settlement Agreement that arose from an arbitration proceeding ostensibly convened to address this very question. The Settlement Agreement on its face does purport to resolve the issue of the Contractor Fee. Gilbert, however, claims that the arbitration was a sham for a number of reasons, including a commonality of ownership interests among the arbitration petitioner and respondents, and that the Arbitration Settlement Agreement should therefore be disregarded. The arbitration purported to pit the Debtor/Petitioner, through its sole general partner, CAA/Kennington Properties, against Respondent's ABI and B.F. General Associates, a Pennsylvania Limited Partnership ("BFG").[1] BFG is a limited partnership comprised of an entity known as DEVCO (another partnership) and individuals Albert Eisen and Gilbert. The Arbitration Settlement Agreement was signed on behalf of BFG by General Partners, Devco and Eisen only, and not Gilbert. Gilbert accordingly disavows the Settlement Agreement for this reason also. By virtue of Claim # 4 filed in this Bankruptcy case, Gilbert now seeks to litigate his own entitlement to be paid the Contractor Fee.

---

[1] The latter entity, BFG, was an original co-partner with CAA/Kennington in the ownership of the Debtor. According to Gilbert, BFG was wrongfully deprived of its 50% partnership interest in the Debtor in 1991 through a series of wrongful acts and/or omissions by CAA/Kennington and others. Gilbert's various claims with respect to that matter are the subject of his Claim # 6 herein and, as noted, his separate lawsuit pending in Montgomery County, Pennsylvania.

Certain additional background is essential to an analysis of the present Motion. As noted above, the general partners of BFG are Gilbert, Albert Eisen and an entity known as DEVCO. DEVCO is a limited Partnership, the general partners of which are Berel Altman, Irving Altman and David Altman, (collectively the "Altmans"). These same individuals own and control the above named contractor, ABI. During the course of above referenced renovation work at the hotel property a dispute arose between Gilbert and the Altmans over costs that were being incurred in connection with the construction project. Specifically, there came a time when the Debtor possessed insufficient funds to meet the operating expenses of the hotel and the costs of its renovation work.

This produced for the Debtor what are known in the vernacular as "cash shortfalls." A method adopted by the Debtor to address these cash shortfalls was to issue "cash calls" to its respective general partners, Kennington and BFG. On receipt of such a cash call, BFG would in turn raise its share of the Debtor's cash shortfall through a cash call of its own to its general partners Gilbert, Eisen and DEVCO.

As the renovation project proceeded, the Debtors's cash shortfalls grew ever larger. This prompted a protest from Gilbert to the Altmans over the latter's supervision of the construction project through their company ABI. The upshot of this protest and subsequent negotiations between Gilbert and the Altmans, was an agreement between the two which provided, *inter alia*, that Gilbert would be relieved from an obligation to fund future cash shortfalls, but in exchange would have his percentage partnership interest in BFG reduced. Prior to consummation, this agreement somehow went awry, prompting Gilbert to initiate a lawsuit in the United States District Court for the Eastern District of Pennsylvania at Civil Action No. 87–4797, styled: *Alfred A. Gilbert v. DEVCO, Berel P. Altman, Irving Altman, David Altman, and B.F. General Associates.* In this suit, Gilbert sought essentially to have the District Court confirm the terms of Gilbert's agreement with the Altmans (as he understood it) over their alleged refusal to honor the agreement. A copy of Gilbert's complaint in the foregoing litigation is attached as Exhibit F to the Motion now before this Court.

The Debtor and Kennington argue that a fair reading of Gilbert's 1987 complaint suggests that at that time it was Gilbert's position that the Debtor's cash shortfalls were attributable to construction cost overruns which, in turn, were attributable to gross mismanagement of the renovation project on the part of the Altmans and/or ABI. This they assert is diametrically opposite to the position Gilbert now advances to the Court, which is that the cash shortfalls were attributable to 1) excessive hotel operating expenses, or 2) construction costs related to latent defects or owner authorized changes. The latter point as to the cause of the overruns is of crucial significance because the parties are in agreement that construction costs beyond budget did not constitute surchargeable "overruns" under the construction contract (and hence would not adversely impact the contractor's entitlement to be paid the Contractors Fee) where the same were due either to latent defects or owner authorized changes. That result follows logically since 1) latent defects, by definition, could not have been foreseen by the contracting parties and thus warrant relaxation of any budgeted cost ceiling and 2) owner authorized changes, again by definition, involve consensual modifications to the original contract price. The significance of construction cost overruns in the first instance lay in the fact that the construction contract between the Debtor and ABI provided for a $26 million dollar guaranteed maximum price to the Debtor, but further provided for a $3 reduction in the $4.3 million dollar Contractor Fee for every $1 by which actual costs exceeded the guaranteed maximum cost. Thus, construction cost overruns could act to reduce or entirely eliminate the construction fee payable under the contract.

The foregoing 1987 District Court litigation resulted in a bench opinion by (then) Chief Judge John P. Fullam, the transcript of which is appended to Gilbert's response to the instant Motion. In his opinion, Judge Fullam concluded from the evidence that Gilbert and the Altmans had indeed agreed that Gilbert was to be relieved from future cash calls as a partner of BFG, and that in that respect they had further agreed on certain consequences to Gilbert, including most notably the reduction of his partnership interest in BFG. Judge Fullam found further, however, that the parties had failed to agree, or had different understandings, as to certain particulars of that basic agreement or matters ancillary to it. Judge Fullam, accordingly, confirmed the basic agreement and fashioned a remedy designed to resolve *in toto* the matters in dispute. His decision of June 15, 1988, was appealed to the Third Circuit Court of Appeals but the matter was settled by the parties prior to that Court's adjudication.

Gilbert does not appear to dispute, nor could he, that the 1987 District Court litigation involved matters relatively close to matters now in issue before this Court. He argues, however, that the requested application of the doctrine of judicial estoppel is unwarranted. In this respect, Gilbert's argument is threefold.

First, Gilbert asserts that even if the Movants are found to be correct in their charge that Gilbert has adopted an inconsistent position in this litigation, versus the 1987 District Court litigation, judicial estoppel is not an available remedy because neither the Debtor, nor Kennington were named parties to the 1987 lawsuit. Second, Gilbert argues that because the District Court in 1987 did not adjudicate whether the Debtor was experiencing cash shortfalls, and, if so, their make-up, the Movants cannot now demonstrate that Gilbert prevailed or was benefitted by his allegedly inconsistent position in the earlier litigation. The latter fact, Gilbert asserts, precludes application of the doctrine of judicial estoppel. Finally, Gilbert takes issue with the Movants' characterization of the position taken by him in the 1987 litigation and asserts that, in fact, his position then and his position today, *vis a vis*, the Debtor's cash shortfalls are not inconsistent at all. Having carefully considered these arguments, the Court finds each unconvincing.

### Discussion.

Gilbert's above three arguments will be addressed in inverse order.

**I. Gilbert's position in 1987 versus his position today relative to the composition of the cash shortfalls experienced by the Debtor during the Hotel renovation project.**

The crux of Gilbert's argument in this respect appears to be that in 1987 he did not allege *of his own knowledge* that there were cash shortfalls being experienced by the Debtor, only that others, notably the Altmans, had told him there were shortfalls, and had in turn presented him with cash calls. Similarly, Gilbert asserts that in the 1987 litigation he took no firm position as to the cause or the make-up of what he maintains at the time were merely "alleged" or "purport-

ed" cash shortfalls. In this respect, Gilbert stresses that the focus of his 1987 lawsuit was to confirm the terms of an agreement he thought he had with the Altmans, not to identify the existence, the cause and/or the make-up of the Debtor's cash shortfalls. The Debtor, while not disagreeing entirely with the latter point, insists nevertheless that Gilbert's 1987 pleading evinces his adoption of a position that cash shortfalls were being experienced by the Debtor, and that they were attributable to construction costs overruns which were themselves the fault of ABI or the Altmans. In support of their respective positions, Gilbert and the Debtor have suggested that the Court focus its attention on certain specific paragraphs of the 1987 Complaint, which the Court has done, including the following:

¶ 20. The alleged shortfalls arose from the Altman's and Devco's gross mismanagement of the construction at Benjamin Franklin Hotel, of which they were in sole control.

¶ 28. As the negotiations progressed and during the summer of 1986, Gilbert learned from the Altmans that the cash shortfall was purportedly over $9,000,000 and not $7,000,000 as he had been told earlier.

¶ 31. At this time, because of the mismanagement by the Altmans, over which he had no control and no apparent influence, Gilbert went to Devco's controller, Robert Bluth, and later to Irving Altman and told them that he could no longer work with Berel Altman and, while he would be responsible for his share of the shortfall as reported to him of $7,000,000, he wanted to make appropriate arrangements to reduce his share in B.F. General without incurring any detrimental tax ramifications and receive the return of the monies he had already invested.

¶ 36. In or about early November of 1986, Gilbert was informed by he Altmans, for the first time, that the shortfall and cash needs were purportedly approximately $11,000,000.

¶ 37. The shortfall arose as a direct result of the Altmans gross and willful misman-

agement of the construction at the Benjamin Franklin Hotel during which construction, upon information and belief, the Altmans and their related and affiliated companies received excessive profits as subcontractors and charged to Hotel Associates expenses from unrelated work they were doing for other persons, including labor charges for phantom employees who performed no work at the Benjamin Franklin Hotel.

Having considered Gilbert's first argument, particularly in light of the foregoing paragraphs from his 1987 Complaint, the Court views his argument as disingenuous, at best. It is preposterous for Gilbert to even attempt to distance himself from the contention that the Debtor had in fact experienced significant cash shortfalls at the time Gilbert initiated his 1987 lawsuit. The very agreement he sought to have the District Court confirm was premised on those cash shortfalls and the cash calls they generated. Gilbert's 1987 pleading in no way suggests that Gilbert reserved any question, or harbored any doubt as to whether the Debtor's cash shortfalls were genuine. His testimony at the 1987 trial, moreover, was to the same effect. In that respect, the full transcript of proceedings before the District Court on June 13, 1988 and June 15, 1988, has been made part of this record. The Debtor points, persuasively to the following exchanges with Gilbert:

Q. What was happening with regard to the construction and operating costs at this period of time—that is, 1986 at the Ben?

A. They started to escalate.... In looking at the numbers I said we had better prepare for at least $5 million and we have to do something about funding this. And it was agreed that the shortfall would be about $5 million and we tried to get the bank to fund at least part of it.

(N.T. 37:25—38:15)

Q. Did you discuss further—did you discuss any specific terms with Mr. Irving Altman when you were talking with him in July of 1986 that you would be looking for [sic] the reduction of your partnership interest?

A. No. I said that I was going to consult with Ivan Light because I knew there were a great many tax ramifications and problems that I might be subject to if they bought me out entirely. And I had suggested at one time I would love to be bought out entirely but I didn't think that was possible. So that I would have to remain in for a lot of tax reasons. And whatever we could work out that was fair and equitable, I wasn't looking for any money up front or anything else, all I wanted to do was to limit—I said, "I am going to be responsible," this was in July of 1986, "I am going to be responsible for my share of the short falls and whatever responsibilities I have cash wise to this operation to date."

Q. And what did you understand that the cash short falls were at that point?

A. About seven and a half million dollars.

(N.T. 59:20—60:30).

Gilbert further testified:

A. I had heard ... at a B.F. General meeting at which time the Altmans said they were prepared to put up their money and fund the shortfall. They asked Albert Eisen if he would and he said he would put up his share. Asked me and I said I would not. They asked me why and I said, "Because I have not liked what you have done for the last two years. It is 100 percent mismanaged. I don't even want to sit here and contest with you. We have working on an arrangement to get me out of active participation here. Work the deal out and we will stop getting into a pissing contest."

(N.T. 67:34—68:8)

The contents of Gilbert's 1987 pleading and his foregoing trial testimony amply establish to the satisfaction of this Court that Gilbert's position in 1987 was that the Debtor had a multi-million cash shortage which was caused by the Altmans' mismanagement of the construction project.

Assuming the accuracy of the foregoing observation, *arguendo*, Gilbert insists that the Court must still distinguish between cash shortfalls and construction cost overruns, because its only the latter which adversely impact the payment of the Contractor's Fee.

In this respect, Gilbert insists that the cash shortfalls detailed in his 1987 complaint were attributable to numerous overhead or non-construction items which did not constitute construction cost overruns under the terms of the parties contract, such as construction loan interest, insurance, taxes and professional fees. The Debtor in response, however, points out that the construction budget for the project contained a specific cost code for every single expense category to which Gilbert alludes; thus indicating that these "soft costs" did in fact form part of the construction contract budget. In this respect, a typical payment application voucher for the project is attached to the Debtor's reply brief as Exhibit "A," and it indeed confirms the Debtor's position. Significantly, this very voucher is signed by *Gilbert!* Gilbert argues that notwithstanding their inclusion in the budget and on the aforesaid payment voucher, the soft costs in question were nevertheless not intended to be included in construction costs from which an overrun in excess of the guaranteed maximum contract price might be found. In support, Gilbert points to relevant language from the construction contract, as follows:

### 4. *Guaranteed Maximum Cost*

Contractor shall waive all rights to reimbursement and shall timely pay, and shall hold Owner and each of its partners harmless from, and shall defend and indemnify Owner and each of its partners with respect to all costs, expenses, liabilities and claims which Contractor was obligated to pay as a project cost under section 5 ... to the extent that the aggregate amount of such costs exceed [$26 million]....

### 5. *Payments and Reimbursements*

(a) Reimbursements.

Subject to the provisions in section 4 above and the adherence by Contractor to its obligations herein, Contractor shall be reimbursed as an expense of the Project for all reasonable and direct costs and expenses ... incurred by Contractor during the course of construction and which are provided for by the Construction Budget. These costs shall include the following:

(i) Permits. The cost of all permits, fees, and licenses required by local governmental agencies in order to undertake and complete the development;

(ii) Payroll. The cost of payroll contributions, houses, taxes and fringe benefits normally paid on behalf of labor and construction supervision that are reasonably allocable to the Project plus all contributions to pension or other related retirement plans;

(iii) Bonds. The premium for any completion and/or labor and material bonds required by and local government agencies, and/or any construction lender;

(iv) Labor and Materials—Subcontractors. The aggregate amount of all subcontracts entered into by contractor for the furnishing of labor, materials, tools and/or equipment in connection with the construction of the Improvements;

(v) Labor and Materials—Contractor. The direct cost tot he Contractor of any and all labor, materials, tools and equipment actually furnished by Contractor in direct connection with the construction of the Improvements; provided, however, there shall be no rental charges for tolls and construction equipment belonging to Contractor;

(vi) Insurance. The cost of all workers' compensation insurance and comprehensive general liability insurance payable by Contractor based upon an audit by the insurance carrier, limited to the Contractor's payroll for work performed on the Project; the cost of all other insurance premiums incurred by Contractor reasonably allocable to the Project to the extent involved by the insurance company for coverage at the Project.

(vii) Modifications to Plans. The cost of change orders.

(viii) Miscellaneous. The cost of an site maintenance of books and records of the Project and audits thereof, as well as the cost of office supplies consumed and office equipment used at the Project site.

(ix) Taxes. All sales taxes, gross receipts taxes if the basis therefor includes the cost reimbursement by Owner, all em-

ployee and job related taxes payable by Contractor.

Having considered Gilbert's argument in light of the above language from the Contract, the Court rejects it. While it is true that certain of the soft costs to which Gilbert has pointed, such as construction loan interest and legal fees, are not enumerated in the list of reimbursable expenses in above Section 5 of the Construction Contract, neither are they excluded. In this regard, the list appears illustrative only. The preamble to paragraph 5, on the other hand, provides for reimbursement to ABI of *all* direct costs and expenses provided in the construction budget. In sum, the record as it stands suggests that the disputed soft costs formed part of the construction budget and that Gilbert in 1987 was aware of that fact. Accordingly, the Court finds that little, if any, distinction exists between cash shortfalls as opposed to construction cost overruns as pled by Gilbert in his 1987 Complaint. Rather, it is clear that the two were virtually synonymous.

Having already concluded that Gilbert's position in 1987 was that the Debtor's cash shortfalls (i.e., construction costs overruns) were due to mismanagement by the Altmans, the remaining task is to contrast that position with his position today. As noted, Gilbert's view today is that the Debtor's cash shortfalls were attributable to excessive operating expenses, latent defects, and/or owner authorized charges. This position is obviously and utterly at variance with Gilbert's earlier position. Thus, the Court concludes that if there is otherwise no bar to the application of the doctrine, Gilbert will be judicially estopped from now changing his position as to the cause of the Debtor's prior cash shortfalls.

## II. Judicial Estoppel.

### A. *The Element of Reliance*

Judicial estoppel, sometimes referred to as "preclusion by inconsistent positions" is an equitable doctrine which precludes a party from asserting a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position. *Delgrosso v. Spang and Co.* 903 F.2d 234, 241 (3d Cir.), *cert. denied* 498 U.S. 967, 111 S.Ct. 428, 112

L.Ed.2d 412 (1990). The earliest articulation of the doctrine of judicial estoppel in the Third Circuit is found in *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510 (3d Cir.1953) although the doctrine apparently traces its routes to the Supreme Court's enunciation in *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895). In *Scarano,* after distinguishing judicial estoppel from equitable and collateral estoppel, the Circuit Court observed that:

The "estoppel" of which, for want of a more precise word, we here speak is but a particular limited application of what is sometimes said to be a general rule that "a party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits." II Freeman on Judgements Sec. 631 (5th ed. 1925). Whether the correct doctrine is that broad we do not decide. The rule we apply here need be and is no broader than this. A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. Such use of inconsistent positions would most flagrantly exemplify that playing "fast and loose with the courts" which has been emphasized as an event the courts should not tolerate. See *Stretch v. Watson,* 1949, 6 N.J.Super. 456, 469, 69 A.2d 596, 603, reversed in part on other grounds, 5 N.J. 268, 74 A.2d 597. And this is more than affront to judicial dignity. For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.

In *Scarano,* the Circuit added the following significant caveat:

At the same time, in the nature of the problem, it has rightly been pointed out by the Court of Appeals for the District of Columbia that in applying this rationalization "each case must decided upon its own particular facts and circumstances." *Galt*

*v. Phoenix Indemnity Co.,* 1941, 74 App. D.C. 156, 120 F.2d 723, 726.

The Circuit Court's caveat in *Scarano* has particular implication here because the parties have directly drawn into question the permissible reach of the doctrine of judicial estoppel. Specifically, and as noted above, Gilbert asserts that the doctrine has no application in the present context because the District Court in 1987 did not find as a matter of fact or law that the Debtor was experiencing cash shortfalls, nor did the Court adjudicate the composition of any such shortfalls. Rather, Gilbert maintains, the Court merely confirmed that Gilbert had a binding agreement with the Altmans to be relieved of future cash calls and in turn suffer the reduction of his partnership interest in BFG. Citing *Resolution Trust Corp. v. Farmer,* 823 F.Supp. 302, 314 (E.D.Pa. 1993) and *In re Walnut Associates,* 145 B.R. 489, 498–99 (Bankr.E.D.Pa.1992), Gilbert argues that before imposing a judicial estoppel on him relative to the existence and make-up of cash shortfalls, the Court must first find that the earlier Court reached a judicial determination based upon his allegedly inconsistent position.

The Debtor and Kennington dispute Gilbert's position that there exists any requirement that the allegedly inconsistent position of the party sought to be estopped must have been specifically or expressly adjudicated or adopted by the earlier Court. In this respect, the Debtor and Kennington note that in *Scarano,* the Circuit Court itself noted that the precise basis of the jury verdict in the relevant earlier litigation was unclear on the appellate record, thus belying any notion that the trial court had adopted the alleged inconsistent position which was sought to be estopped. Similarly, the Debtor cites to *AFN, Inc. v. Schlott Inc.,* 798 F.Supp. 219, 224–227 (D.N.J.1992), a persuasive 1992 decision wherein the court surveyed Third Circuit precedent on the point in question and concluded that there is "no requirement in the law of the Third Circuit that a party have been successful in its prior positions...." 798 F.Supp. at 227. Giving Gilbert the benefit of the doubt as to this issue, the best that can perhaps be said is that there is a split of authority over whether controlling law in this circuit requires adoption of an allegedly inconsistent position in the earlier court as a predicate to a later judicial estoppel. If this is so, then after considering the authorities cited, the Court concludes that the Debtor and Kennington's position, and the authority upon which they rely, represents the better view. In this respect, this Court concludes that adherence to a requirement that an earlier Court have expressly confirmed or adopted the allegedly inconsistent position of the party now sought to be estopped compels an overly narrow construction of the doctrine of judicial estoppel and one which is at odds with its underlying prophylactic purpose as expressed by the Third Circuit Court of Appeals in *Delgrosso v. Spang & Co.,* as follows:

> Unlike the concept of equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between the litigant and the judicial system, and seeks to preserve the integrity of the system. *Oneida Motor Freight [v. United Jersey Bank],* 848 F.2d [414] at 419 [ (3rd Cir.1988) ]. To permit a party to assume a position inconsistent with a position it had successfully relied upon at a past proceeding "would most fragrantly exemplify ... playing "fast and loose with the courts" which has been emphasized as an evil the Courts should not tolerate.

903 F.2d at 241.

Having said the foregoing, the Court is quick to add that it is far from clear that Gilbert could prevail in his argument even if the Court were to conclude that there does exist the requirement he contends. As hereinbefore noted, Gilbert prevailed in the 1987 District Court litigation and received judgment in his favor. In the view of this Court, that fact would sufficiently satisfy any requirement that this Court find that Gilbert's earlier inconsistent position was adopted, and therefore benefitted him, such that he should now be estopped from taking a position contrary to a position he took in the prior litigation. Departure from this conclusion would not seem warranted simply because the District Court decision was thereafter appealed and then settled by the parties. To accept

that logic is to simply treat the 1987 District Court litigation as if it had never occurred; something this Court is not prepared to do.

### B. *Identity of the Parties*

The final and perhaps strongest argument which Gilbert makes against the requested application of judicial estoppel is that neither the Debtor nor Kennington is entitled to assert the doctrine because neither was itself a party to the 1987 litigation. With regard to this argument, it is true that *Scarano* and its progeny in this Circuit represent decisions wherein the same parties appeared in both the earlier and the later litigations. In the opinion of this Court, however, Gilbert misreads *Scarano* when he suggests that in *Scarano* the Circuit Court *limited* the doctrine of judicial estoppel for all time, only to cases wherein the parties are identical. Indeed, the Circuit Court in *Scarano* specifically noted that the scope of the doctrine may well be broader than the rule which the Court then adopted based on the facts of the case before it. Nothing in the language of the *Scarano* decision, nor those decisions which follow it, suggests an intent on the part of our Circuit Court to preclude application of the doctrine of judicial estoppel in an otherwise appropriate case solely because the identical parties are not present in each of the two subject lawsuits. This, of course, is not to say that the identity of the parties to the two lawsuits in question is by any means irrelevant. To the contrary, the relationship between the earlier and later action is pivotal. The existence of a relationship between an earlier and later action where the doctrine of judicial estoppel is implicated will usually be found, in part, through the common identity of the parties to the two respective lawsuits. A litmus type test, however, which abrogates the doctrine where the same parties are not present, amounts to "throwing out the baby with the bath water." Rather than abrogate this useful and proper equitable doctrine in cases where the parties to the lawsuits are not the same, the Court should instead subject the Movants request to heightened scrutiny to ensure that the application of the requested judicial estoppel is appropriate both on the facts, as the *Scarano* court suggested, and on policy grounds, i.e, in order to preserve the integrity of the judicial system by preventing "fast and loose" conduct by litigants. *Delgrosso, supra.*

In this instance, the Court is satisfied that the requisite nexus is present between the 1987 District Court litigation and the present adversary proceeding to warrant the application of judicial estoppel. Gilbert, of course, was a party to both lawsuits. While the Debtor was not a named party to the 1987 lawsuit, one of its then two general partners, BFG, was a party to that action. The matters in issue, moreover, were intimately related to the matters Gilbert now presses in this Court. In this respect, and in the opinion of this Court, permitting Gilbert to now adopt a differing position as to the cause of the Debtor's cash shortfalls will countenance the precise wrong which the doctrine of judicial estoppel speaks to. Accordingly, the Court declines Gilbert's invitation to find a bar to application of the doctrine in the fact that neither the Debtor, nor Kennington were named parties to the 1987 lawsuit.

Having reached the foregoing conclusion the Court adds however, that there is an alternative rationale which produces the same result. Kennington, as noted, was not a named party to the 1987 action, however, Kennington *is* the assignee of the rights of ABI under the Indemnity Agreement, described at page 424, *supra.* Pursuant to the Indemnity Agreement, Gilbert agreed to indemnify ABI against cost overruns associated with the construction contract. ABI was not itself a named party to the 1987 District Court litigation, however as hereinbefore noted, ABI stands for Altman Brothers, Inc. and each of the Altman Brothers was a named party to the 1987 lawsuit. On the basis of the Indemnity Agreement and Assignment to it of ABI's right thereunder, Kennington has brought a counterclaim in this very action seeking to now recover from Gilbert cost overruns in excess of the aforesaid guaranteed maximum contract price stipulated in the Construction Contract.

As noted in *Mellon Bank, N.A. v. Makoroff,* 153 B.R. 155 (W.D.Pa.1993), judicial estoppel clearly may be applied against a party to a prior lawsuit, "... *or someone in privity*

*with that party.*" Id. at 159 (emphasis added). Privity, in its broadest sense is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. *Petersen v. Fee Intern, Ltd.,* 435 F.Supp. 938, 942 (D.Okla.1975). An assignee is normally understood to stand in privity to his assignor. *Litchfield v. Crane,* 123 U.S. 549, 8 S.Ct. 210, 31 L.Ed. 199 (1887). Kennington and ABI are thus clearly in privity with one another. The Court moreover finds in this instance that there is a sufficient identity of interest between ABI, and its shareholders, the Altman Brothers, with respect to the 1987 litigation to conclude that each stands in privity to the other, for purposes of the judgment which emanated from that lawsuit. In other words, for present purposes, the Court concludes that a finding of judicial estoppel is legitimately reached by virtue of the privity which exists between the present and past parties to the lawsuits in question.

Having arrived at the foregoing conclusion, the next question, logically, is wither goeth this lawsuit. It is difficult, if not impossible for this Court to see how Gilbert could ever succeed on his claim to a share of the Contractor's Fee when he is now bound to his earlier assertion that there were multi-million dollar overruns associated with the construction projects which stemmed from the Altmans' mismanagement. Under the terms of the Construction Contract, the Contractor Fee is easily eliminated by virtue of overruns of that magnitude. As a consequence, the Court is inclined at this juncture to grant summary judgment in favor of the Debtor and Kennington, *vis a vis,* their objections to Gilbert's claim, as it may do, *sua sponte,* in an appropriate case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Prior to doing so, however, and consistent with the Supreme Court's admonition in *Celotex,* the Court will afford Gilbert an opportunity to be heard on the question by scheduling a follow-up hearing, at which time, Gilbert must be prepared to advise the Court of a legal theory which would support his recovery and the facts upon which he relies.

An Order consistent with the foregoing conclusions will be entered herewith.