In re Mark S. FINEBERG, Debtor.

Arthur P. LIEBERSOHN,
Trustee, Plaintiff,

v.

Sayed ALI, Alan Cooper, Eastern Public Adjusters, Inc., Albert Fineberg, La Jolla Acquisitions II, Earl Kreider, Norman Rubin, Silvio Salmieri, Special Life Underwriters, Inc., James Shiplett, Defendants,

v.

Mark S. FINEBERG, Dinah Fineberg, and DHF, Inc., Third–Party Defendants.

Bankruptcy No. 92–11857DAS.
Adversary No. 96–0418DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 1, 1996.

Robert Szwajkos, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for Debtor Dinah Fineberg and D.H.F., Inc.

Howard Sobel, Philadelphia, PA, Prior Counsel for Debtor.

Arthur P. Liebrsohn, Plaintiff–Trustee, Philadelphia, PA.

Michael Kaliner, Fairless Hills, PA, General Counsel for Trustee.

Marc A. Zaid, Bala–Cynwyd, PA, Special Co–Counsel to Trustee.

Michael S. Lubline, Drescher, PA, Special Co–Counsel to Trustee.

Lawrence Corson, Philadelphia, PA, for Defendants Alan Cooper, Earl Kreider, Silvio

Salmieri, James Shiplett and Eastern Public Adjusters, Inc.

Robert J. Hoelscher, Philadelphia, PA, for Defendant Norman Rubin.

Sayed Ali, LaJolla, CA, pro se.

Albert Fineberg, Pompano Beach, FL, pro se.

LaJolla Acquisitions II, LaJolla, CA, pro se.

Special Life Underwriters, Inc., Bryn Mawr, PA, pro se.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding") represents a unique and ingenious effort by MARK S. FINEBERG ("the Debtor") to transform the seemingly worthless remains of LA JOLLA ACQUISITIONS II ("the Partnership"), an unsuccessful realty partnership of which the Debtor was an "organizing partner" and its accountant, into a significant monetary recovery from several of the presumably financially liquid investors ("the Participating Partners") of the Partnership, based mainly upon the tax deductions taken by the Participating Partners. Despite his enlistment of a former adversary, ARTHUR P. LIEBERSOHN, ESQUIRE ("the Trustee"), the Trustee in the Debtor's Chapter 7 case, which was originally closed in 1994, to his cause as plaintiff in the Proceeding, we find the Debtor to be disingenuous as well as ingenious in his efforts. We therefore find insufficient evidentiary basis to support most of his self-serving claims. We also find that the claims are barred on other grounds, including that all of the claims have not been timely asserted; are in part outside of the scope of our limited jurisdiction over the nondebtor Partnership's affairs; and are in part barred by dismissal of a related prior action and possibly judicial estoppel. Consequently, judgment will be entered against the Trustee, as well as in favor of the third-party defendants on the unproven third-party claims.

## B. FACTUAL AND PROCEDURAL HISTORY

The parties executed the Partnership Agreement ("the Agreement") forming the Partnership on January 2, 1986. The "Organizing Partners" were Defendant SAYED ALI ("Ali") and his wife, Fatma Ali; Defendant NORMAN RUBIN, the Debtor's uncle; and the Debtor. The Debtor is a certified public accountant who at all times resided in the Philadelphia area. Ali was his associate in several of his other real estate transactions. The role of Rubin, also a Philadelphia-area resident, was to solicit other investors from the Philadelphia area.

The purpose of the Partnership was to acquire, own, operate, manage, maintain, lease, hold for investment and ultimately sell, exchange, or otherwise dispose of four residential properties supplied by the Organizing Partners, which were located in LaJolla, California. Rather than paraphrase the significant provisions of the Agreement, we quote extensively from its following relevant provisions:

2.2 *Additional Contributions; Loans.* If the capital contributions of the Partners ... are insufficient to ... maintain or operate partnership property ... the Partners shall be obligated to contribute to the Partnership the additional funds required in proportion of their respective interests in the profits of the Partnership.... If any Partner fails or refuses to contribute his proportionate share of any additional capital which may be required as aforesaid at the same time that the other Partners are ready, willing and able to contribute their proportionate share, then the nondefaulting Partners shall have the right, but not the obligation, to lend the total additional funds required to the Partnership. If the nondefaulting Partners lend any funds to the Partnership, the amount of any such loan shall not be regarded as a contribution to capital nor enlarge such Partner's capital account, but shall be a debt due from the Partnership to such Partners, shall bear interest at the maximum contract rate permitted by law and shall be repaid in full, together with inter-

est, before any distribution to the Partners....

2.3 *Capital Accounts.* An individual capital account shall be maintained for each Partner to which his contributions to capital and his share of net profits shall be credited and to which distributions and his share of net losses shall be decided....

2.4 *Deficit Restoration Provision.* Notwithstanding anything contained herein to the contrary, if, after (i) a sale or other disposition of all or substantially all of the Partnership assets and/or the liquidation of the Partnership (ii) the allocation of all net profits or net losses realized therefrom for federal income tax purposes, and (iii) the distribution of cash and property in accordance with the provisions hereof, any Partner has a negative (deficit) balance in his capital account, then immediately upon such liquidation and termination the Partner with such negative (deficit) balance in his capital account shall contribute cash sufficient to cause his capital account to be zero, and the cash funds so contributed shall become part of the cash proceeds distributed among the Partners in accordance herewith.

. . . . .

3.4 *Distributions of Available Cash.* The term "Available Cash" means all cash receipts of the Partnership from whatever source derived after (i) operating expenses, (ii) amounts set aside for reasonable reserves and (iii) payments on the partnership's current obligations. Available Cash shall be distributed at such times and in such amounts as the partners shall from time to time determine in the following order of priority:

(a) First, to the repayment in full, together with interest, of all loans and advances made by the nondefaulting Partners pursuant to Paragraph 2.2, on the basis of the first funds loaned or advanced being the first funds repaid.

(b) Second, seventy-five percent (75%) to the Participating Partners as a class and twenty-five percent (25%) to the Organiz-

ing Partners as a class in accordance with Paragraph 3.3.

. . . . .

5.3 *Compensation of Ali, Fineberg and Rubin.* Except as expressly and specifically provided in this Agreement, the Partners shall not be entitled to any salary or other compensation for services performed in connection with their duties as Partners of the Partnership. Ali, Fineberg and Rubin shall be entitled to compensation from the Partnership as follows:

. . . . .

(b) Fineberg shall receive (i) a selling commission equal to 8% of the capital contributions received by the Partnership from those Participating Partners introduced by Fineberg, such commission to be payable upon organization of the Partnership from the capital contributions of the Participating Partners, and (ii) $5,000 per year for tax and accounting services to be rendered to the Partnership, payable on or before the 31st day of December.

. . . . .

5.5 *Partnership Expenses.* The Partnership shall directly pay, or shall reimburse the Partners for, all direct expenses of the Partnership, including ... (d) legal, accounting, audit, brokerage and other fees, ...

. . . . .

8.1 *Dissolution of Partnership.*

8.1.1 Any one or more of the following acts or omissions shall be deemed an Event of Default under this Agreement:

(a) ... any Partner commences a voluntary case under bankruptcy ...

(b) Any Partner shall attempt to withdraw from the Partnership or to dissolve or obtain dissolution of the Partnership in any manner other than pursuant to this Agreement.

. . . . .

8.1.2 The Partnership shall be dissolved upon the earliest of (a) the written agreement of all Partners to dissolve the Partnership, (b) the sale or other disposition by the Partnership of all or substan-

tially all of its assets, ... or (d) in the case of an Event of Default, upon giving of notice by the nondefaulting Partners of their election to dissolve the Partnership at any time after the occurrence of any Event of Default specified in Paragraph 8.1.1. Neither the ... dissolution, bankruptcy nor withdrawal of a Partner shall dissolve the Partnership unless the surviving or remaining Partners shall elect to dissolve as provided in this Agreement....

The Partnership sold slightly more than thirteen (13) units at $40,000 per unit, totalling about $540,000. The Organizing Partners were credited with a total of $205,000 to their capital accounts based upon their contribution of the equity of the four residential properties owned and operated by the Partnership. The total value of the properties were agreed to be $1,340,000, subject to existing encumbrances totalling $1,135,000. The $205,000 equity was allocated at $75,834 to Ali, $75,833 to the Debtor, and $53,333 to Rubin.

The Agreement provided that net losses would be allocated by providing ninety-nine (99%) percent to the Participating Partners as a class, and one (1%) percent to the Organizing Partners as a class. The Agreement also provided, basically, that net profits be allocated seventy-five (75%) percent to the Participating Partners and twenty-five (25%) percent to the Organizing Partners. The Partnership in this way provided a tax-sheltered investment for the Participating Partners.

The Debtor claimed that, for each of the years 1986 through 1990, Ali, who was designated as the Managing Partner, forwarded check stubs, bank statements and canceled checks to the Debtor's accounting firm, Fineberg & Associates, P.C. ("F & A"), for the purpose of preparing the annual tax returns and form K–1's. F&A prepared K–1's and sent them to the Participating Partners each year, reflecting losses which ultimately reached a total sum in excess of $1 million. The Participating Partners took deductions for these losses on their respective tax returns.

The Debtor testified that, pursuant to an independent agreement between Ali and him, not disclosed to the other partners, they were both to make necessary financial advances to the Partnership and credit them on an equal basis. The Debtor further claimed that, as of 1990, Ali had advanced $300,000 and he himself had advanced just over of $160,000. The Debtor also claimed that he sold his home and paid Ali $200,000 from the sale in order to even out their respective account balances.

The Debtor further testified that, in 1990 and 1991, he became concerned about Ali's increasing lack of communication with him. Without consulting any other partners, the Debtor hired a local real estate consultant, Richard E. Riel, to investigate Ali's financial status and to determine the legal status of the Partnership's properties. On August 13, 1991, Riel reported to the Debtor that Ali was experiencing financial problems and that numerous lawsuits, liens, and lis pendens actions had been recorded against Ali and his wife. Riel's report also noted numerous deeds of trust having been recorded against three of the Partnership's properties and revealed that the fourth property, 30 Caminito Monrovia, had already been sold in 1989 for a slight profit.

Riel's report reflects that, during 1990 and 1991, the titles to the three remaining properties were transferred to Ali's name *and to the Debtor's name* on several occasions, thereby allowing the deeds of trust to be recorded against these properties. One property was foreclosed on August 6, 1991, just before Riel's report was issued. The Debtor provided no documentation or accounting to explain any of the deed transfers. He justified the transfers into his own name as necessary measures to protect the properties from dissipation and misuse by Ali.

On August 19, 1991, and again on October 13, 1991, the Debtor wrote to Rubin and the Participating Partners and advised them of the result of Riel's investigation into what he termed as exclusively Ali's questionable activities. In response a meeting attended by the Debtor, Rubin, and several of the Participating Partners was organized in November 1991. At that meeting the Debtor informed the other partners that Ali had disappeared and that all of the properties were lost. In fact, one of the properties was not the subject of foreclosure until 1996, but at that point the Partnership ceased doing business and basically abandoned the properties. The Participating Partners harbored doubts as to what actually happened to the properties, but they were apparently ultimately satisfied to take their quite handsome tax deductions on the basis of the K–1's supplied by the Debtor. In so doing, they may have been greedy, inappropriately willing to close their eyes to any suspected wrongdoings, and have acted in violation of the Internal Revenue Code. However, the Debtor or the Trustee would not appear, for reasons hereafter stated, to be the proper parties to take them to task for such conduct.

The Debtor, meanwhile, incorporated an entity named D.H.F., Inc. ("DHF"), which are the initials of his mother, Dinah H. Fineberg ("Dinah"). Dinah was designated as DHF's President, and the Debtor as its Treasurer. On December 5, 1991, the Debtor assigned to DHF all of his claims arising out of the Partnership. Shortly thereafter, on December 13, 1991, Ali, who had supposedly disappeared and has in fact reportedly never resurfaced, conveyed one of the properties to the Debtor and the Partnership. Then, on March 30, 1992, the Debtor filed the Chapter 7 bankruptcy case in which the instant Proceeding was ultimately filed.

Two adversary proceedings were filed in the initial phase of this case. The first, filed by Republic Bank ("the Bank") on August 10, 1992, challenged the dischargeability of a debt of $88,493.81 on the basis of 11 U.S.C. § 523(a)(2)(B). The substance of this proceeding, as noted in the district court opinion affirming our decision in favor of the Debtor, published at 170 B.R. 276 (E.D.Pa.1994), was, *inter alia*, that the Debtor claimed income of $175,000 in 1990 on its loan application, but disclosed only $30,000 as his 1990 income on his bankruptcy statement of affairs. *Id.* at 278. The Debtor prevailed in this proceeding when he surprised the Bank by not appearing at trial and rendering the Bank unable to prove its case.

214

The second was filed by the Trustee on January 3, 1994, against the Debtor's sister, Penny Clark, and DHF to recover a $40,000 automobile alleged paid for and utilized by, but not titled to, the Debtor. Judgment was entered in favor of the defendants after a brief trial of February 16, 1994, when, again in light of the Debtor's absence, the Trustee failed to present evidence sufficient to make a case. Neither of these proceedings inspired our confidence in the Debtor's general credibility or reliability.

The Debtor listed his interest in the Partnership on his bankruptcy Schedules, designating the value as "unknown." Rubin and several of the Participating Partners were listed as creditors holding unsecured unliquidated claims against him. After losing his adversary proceeding, the Trustee did not make any further efforts to administer any assets of the estate, and he filed a no-asset report on March 30, 1994. Shortly after the proceeding brought by the Bank was returned upon an appeal to the Court of Appeals which we believe was ultimately abandoned, the Debtor received his discharge and the case was closed on November 15, 1994.

On May 2, 1994, the Partnership, represented by, *inter alia*, Marc A. Zaid, Esquire, filed a federal lawsuit ("the Partnership Case") against several of the Participating Partners, which asserted most of the claims for cash contributions re-asserted by the Trustee in Counts I and II of the Proceeding, *see* pages 214–15 *infra*, per Zaid as his special counsel. On October 20, 1994, apparently conceding the lack of a sufficiently large claim against each of the defendants necessary to assert federal diversity jurisdiction, Zaid executed a dismissal praecipe in the Partnership Case in which he agreed that "the Complaint filed in the above action shall be dismissed, *with prejudice* as to any possible reinstatement in Federal Court, but *without prejudice* to Plaintiff's right to pursue the same substantive claim, against the same Defendants, in State Court."

To our surprise, the Debtor, on February 7, 1996, filed a motion to reopen this Chapter 7 bankruptcy case, contending that this action was necessary to resolve certain "open issues" relative to the Partnership. Despite the Participating Partners' vigorous opposition, the motion was granted and the Trustee was re-appointed to investigate this alleged new potential estate asset.

On April 12, 1996, the Trustee, per Zaid, now appointed as his special counsel, filed the Proceeding, and thereafter filed a motion seeking our approval of an agreement among the Debtor, the Trustee, DHF, and Zaid and co-counsel, whereby DHF, the Trustee, and special counsel would each share one-third of any recovery in the Proceeding. Over, again, the apparently overly vigorous opposition of the Participating Partners, this agreement was approved by us on May 14, 1996.

The causes of action set forth in the seven-count Complaint in the Proceeding are as follows: (1) breach of the Agreement by the Participating Partners, allegedly entitling the Trustee to recover over $600,000 from parties having negative capital accounts under § 2.4 of the Agreement (*see* pages 211–12 *supra*); $167,373 on account of loans to the Partnership by the Debtor, plus $49,082 interest thereon; $5,000 for the Debtor's payment to Riel; and $24,000 and $2,500 due to the Debtor for commissions and accounting fees, respectively; (2) distribution of assets of the Partnership from the above-described sums collected for breach of the Agreement, less any Partnership debts; (3) a recovery of the Debtor's alleged loans of $167,323 to the Partnership; (4) the $49,082 interest allegedly due on the Debtor's loans to the Partnership; (5) reimbursement of the Debtor's $5,000 advance to Riel; (6) the $24,100 alleged balance due on the Debtor's commissions; and (7) $2,500 for the accounting fees allegedly owed by the Partnership to the Debtor.[1]

With regard to the first count of the Complaint, the Trustee alleges that the defen-

1. In the first page of his reply brief, the Trustee restates his demand for the loans advanced and interest thereon as $140,538 and $53,404.44, respectively, and seeks the recovery of the Debtor's "positive capital account" and interest thereon as $75,372.65 and $22,611.80, respectively. It is not clear if or, if not, why the Trustee is no longer requesting payment of the negative capital account balances of the Participating Partners.

dants breached the Agreement by failing "to make the payment of required cash contributions" and that this failure to pay gave "rise to a claim of the Partnership to collect such negative capital accounts." The Trustee further asserts that he is a third-party beneficiary of the defendants' obligations under the Agreement as a creditor of the Partnership.

In the Complaint's second count, the Trustee asserts that, to the extent that the actual amount of money collected by the Partnership from negative capital account restoration payments from the Defendants exceeds the amounts required by the Partnership to pay off its creditors, the remainder of the money paid on account must be distributed to all of the partners of the Partnership pursuant to the Agreement. Additionally, he alleges that, since the Trustee is proceeding in the shoes of the Debtor, he is entitled to receive the Debtor's share of the Partnership assets which are to be distributed to the partners after the payment of the liabilities of the Partnership.

In Count III, the Trustee asserts that the Debtor loaned money to the Partnership, pursuant to the Agreement, which loans the defendants must repay as partners of the Partnership. Specifically, the Trustee alleges that the Debtor loaned a total of $167,-323.00 to the Partnership to make up for deficiencies in the Partnership's coffers which resulted from the lack of rental income sufficient to pay the debts and operating expenses of the Partnership's four properties.

The Trustee further alleges, in Count IV, that the Partnership, and thus the defendants, owe interest on the aforementioned loans by the Debtor to the Partnership at a rate of eight (8%) percent, from January 1, 1992, the first day after the expiration of the Agreement, to August 31, 1995. The significance of the latter date is unclear to us. These calculations result in the total of $49,-082 in interest allegedly due to the bankruptcy estate of the Debtor.

The fifth count of the Complaint avers that the Debtor is owed $5,000 by the Partnership for the payment that he made on behalf of the Partnership and out of his own pocket to Riel, on or about June 1, 1991, for Riel's services in producing his report.

Count VI asserts that the Partnership owes commissions of $24,100 to the Debtor pursuant to the Agreement. The Trustee alleges that a total of $30,800 in commissions were owed to the Debtor and that only $6,700 has been paid to the Debtor toward that amount. This claim is based on § 5.3 of the Agreement, quoted at pages 211–12 *supra,* which provides that the Debtor is entitled to receive a "selling commission equal to 8% of the capital contributions received by the Partnership from those Participating Partners introduced by Fineberg, such commission to be payable upon organization of the Partnership from the capital contributions of the Participating Partners." According to the Trustee, the Debtor introduced five of the Participating Partners to the Partnership and the total contribution paid to the Partnership by these partners was $385,000. It is further alleged that the commissions owed to the Debtor have been recorded on the Partnership's books as a liability since 1987 when the Partnership was organized.

Finally, in Count VII, the Trustee avers that the Partnership owes the Debtor a total of $2,500 for professional fees to which he was entitled for the performance of tax and accounting services that he purportedly provided to the partnership in 1991. Section 5.3 of the Agreement provides that the Debtor is to be paid $5,000 per year by the Partnership for such services, which amount was to be paid by December 31 of each year, from 1986 to 1991, for a total of $30,000. However, § 4.4 of the Agreement states that Fineberg & Associates ("F & A") shall prepare the Partnership's financial statements, not the Debtor. According to the Trustee, the Debtor was paid a total of $27,500, and, therefore, $2,500 is still owed to him for the services that he purportedly provided to the Partnership. The Trustee further alleges that these professional fees have been recorded on the Partnership's books as a liability since 1989. Nevertheless, the Debtor, in his letter of November 7, 1991, advised the Participating Partners that he would perform the accounting services for 1991 for the reduced rate of $2,500 if the partners paid for the prior tax

**216**

and accounting preparation fees owed to him, which they did.

In an order of May 15, 1996, in light of our discussions with interested counsel at the hearing of May 14, 1996, on the motion to approve the settlement among the Trustee, the Debtor, DHF, and special counsel, we entered an order extending the defendants' time to *answer* the Complaint until July 1, 1996, and scheduling the trial on a must-be-heard basis on August 27, 1996.

Unfortunately, the Participating Partners who have actively defended this Proceeding ("the Answering Partners") saw fit to file a dilatory motion to dismiss or for a more definite statement on June 26, 1996, thereby potentially frustrating the scheduling order. When we discovered the filing, we entered an order of July 23, 1996, denying the motion and requiring that an *Answer* be filed by July 26, 1996, upon penalty of entry of a default. Defaults were entered against several non-pleading defendants, including Rubin. However, on August 15, 1996, we granted Rubin's motion for relief from the default.

The Answering Partners joined the Debtor, Dinah and DHF into the Proceeding as third-party defendants. Despite a flurry of discovery motions and motions to dismiss the Complaint as contrary to Zaid's discharge praecipe of October 20, 1994, and of the third-party defendants to dismiss the claims against them in the two weeks before trial, all of these motions were resolved or, in the case of the motions to dismiss, held under advisement pending the trial, which did commence on August 27, 1996, as scheduled.

After completion of the trial on the second trial date of September 4, 1996, having received pre-trial briefs from the Answering Defendants and Rubin, we issued an order giving the parties an opportunity to file post-trial briefs, with the Trustee's opening brief due by September 25, 1996; the Answering Partners' and Rubin's further briefs due by October 16, 1996; and the Trustee's reply brief due on October 23, 1996. The briefs were timely filed.

## C. DISCUSSION

### 1. THE DEBTOR'S LACK OF CREDIBILITY IS FATAL TO THE TRUSTEE'S CASE.

■ Although each party produced an expert accountant and many documents were admitted into the record, we find that the documents presented were inconclusive regarding the Partnership's basic activities. The Debtor hypothesizes, with only inferential evidence to support him, that Ali misappropriated the cash contribution proceeds and the rents and fraudulently transferred partnership assets. The Answering Defendants similarly hypothesize, at great (and repetitive) length in their brief, that the Debtor is equally as culpable as Ali.

Our observation of the Debtor on the stand; his inability to document his contentions despite his position as the Partnership's accountant; and the inconsistent legal positions which he has assumed over the years regarding numerous matters, including those related to this case, cause us to conclude that he was not a credible witness. Since the Debtor was the source of the data regarding which his expert accountant, James D. Mahoney, testified, and he is a necessary link in all of the Trustee's claims, we cannot and will not for that reason grant the Trustee relief on any of these claims.

On the other hand, the Answering Partners' testimony in defense consisted only of that of one of their numbers, Attorney Alan Cooper, and of Alan L. Denis, an expert accountant whose testimony was, similar to that of Mahoney, largely based upon factual hypotheses which were not proven. Cooper was credible, but he was unable to deny acceptance of tax benefits based on documents supplied by the Debtor. Denis identified numerous questionable expenditures, as, for example, country club expenses, from the Partnership's account in Scripps Bank, which the Debtor rather unconvincingly claimed were reimbursed to the Partnership by Ali and him. Denis also provided expert testimony that the alleged loan advances by the Debtor to the Partnership should, under accounting principles, be deemed capital contributions. However, despite producing a lengthy and bombastic brief which often

strays from the record, the Answering Partners presented virtually no evidence in support of their third-party complaint. Rubin's brief, though much shorter, articulated a more convincing discussion of the limitations issue and raised the jurisdictional issue.

In summary, our skepticism in accepting anything stated by the Debtor which was not supported by independent documentation as true, which turned out not to be very much, renders us unwilling to grant any relief in favor of the Trustee. We are most reluctant to provide any relief to which the Debtor, though it be (transparently) indirectly through his mother's corporation, will be the beneficiary. As the Partnership's accountant, he appears guilty of, at best, gross nonfeasance. On the other hand, there was no hard evidence of wrongdoing on the Debtor's part, and any claims against him were also insufficiently proven.

We will flesh out in more detail why our assessment of credibility is fatal to all aspects of the Trustee's case. We will also address the statute of limitations issues raised by both the Answering Partners and Rubin, which we determine, on the basis of reasoning closest to that argued by Rubin, independently supports a decision in favor of the defendants; the issue of whether the Debtor's alleged payments were loans or capital investments; the jurisdictional issue raised by Rubin; the bar of certain issues raised in the Proceedings by the disposition in the Partnership Case; and, briefly, our *sua sponte* invocation of the issue of judicial estoppel. Our decisions on all of these issues support dismissal of certain, and, in some cases, all, of the Trustee's claims. Therefore, these claims are found to be without merit several times over.

We begin fleshing out the significance of our credibility determination against the Debtor by addressing the claims against the Participating Partners based on their alleged negative capital accounts. As these claims were presented by the Debtor, we find too many unanswered questions to accept his figures as accurate. It is not clear where the original cash contributions went, where the rents, whatever they were, went, and how and why the mortgages were not paid. Add-

ed to this are the improper Partnership expenditures for the personal benefit of Ali and the Debtor at country clubs and the like; the totally unauthorized transfer of the properties among Ali and the Debtor; and the equally unauthorized granting of deeds of trust against the Partnership's properties. Given the presence of indisputable improprieties, which certainly could easily have led to unrecorded financial gains by Ali and/or the Debtor at the expense of the Partnership, we are unwilling to accept the Debtor's version of these transactions.

With respect to the Debtor's claim that he is owed a substantial sum on account of his loans to the Partnership, and interest thereon, we will subsequently provide a legal analysis wherein we conclude that, assuming *arguendo* that these monetary advances were made, they should be considered as non-reimbursable capital contributions rather than as loans. *See* pages 225–26 *infra*. However, for purposes of this discussion, we question whether any advances were proven to have been made at all. We agree with the Answering Partners' observations that it seems unlikely that the Debtor had sufficient financial resources to make such contributions, especially if his income was in the $30,000/year range; or, if he did, that he would expend these resources on an enterprise which he, as its accountant, was uniquely positioned to know was doomed to financial failure. We also note that it did not inspire our confidence when the Debtor significantly revised many of his figures, accumulated over the past ten years, on the eve of trial, presumably due to the input of Mahoney indicating that the prior figures were inconsistent.

There is evidence that the Debtor did pay Riel the $5,000 charged for his services. Our basic question on this subject is whether the Agreement contemplates reimbursement for services to investigate the irregularities of partners. The fact that such irregularities allegedly transpired during the Debtor's "watch" as the Partnership's accountant raises a question whether such reimbursement should not have been an out-of-pocket expenditure shouldered by the Debtor. We note that, in his cross-examination, the Debtor

admitted that this expense was incurred without the authorization of the other partners and that, for this reason, it could be disqualified. However, in post-trial briefing, these concessions were apparently forgotten.

Similarly, it is unseemly for the Debtor to demand commissions for raising capital which he possibly was responsible for dissipating, or at best of which he failed to prevent the dissipation. Any engagement performed by him for the Partnership was an exercise in self-dealing, which we are reluctant to countenance in the presence of misappropriation by his other co-managing partner or perhaps by the Debtor himself.

Even more questionable is the Debtor's making a demand for accounting fees. The spectre of self-dealing arises again in connection with such services. It seems to us that the Debtor is possibly chargeable with malpractice in his activities as the Partnership's accountant. In this light, it is brazen for him to expect compensation for these services. Finally, we note that F & A and not the Debtor is designated as the Partnership's accountant. F & A is not a party to this lawsuit, nor does the Trustee purport to represent F & A.

We therefore conclude that the Debtor's lack of credibility undermines each and every claim of the Trustee. The Trustee, relying on the Debtor's testimony to support the preponderance of the factual evidence in his favor, fails in his evidentiary burdens. However, we alternatively note that significant legal issues preclude his recovery on alternative grounds.

2. *ALTHOUGH CALIFORNIA LAW APPLIES TO THE SUBSTANTIVE ISSUES RAISED BY THE TRUSTEE IN THE PROCEEDING, PENNSYLVANIA LIMITATIONS LAW APPLIES TO BAR MOST, IF NOT ALL, OF THE CLAIMS.*

a. Under Pennsylvania Conflicts Law, the Parties' Choice of California Law Controls as to the Substantive Law Issues Presented, But Pennsylvania Law Controls the Limitations Issue.

It is well-settled in this jurisdiction that [w]hen the laws of competing states may apply to a parties' contract dispute, the presiding court must resort to the conflicts of law of the jurisdiction in which it sits in order to determine which state's law governs. *See, e.g., In re III Enterprises, Inc. V*, 163 B.R. 453, 459–60 (Bankr.E.D.Pa.), *aff'd*, 169 B.R. 551 (E.D.Pa.1994), and cases cited therein. Ordinarily, Pennsylvania courts will apply the law of the state with the most significant relationship to the contract in dispute. *Id.* However, when the parties themselves have included a choice of law provision in their contract, absent extenuating circumstances, Pennsylvania courts will honor their choice. *See Admiral Corp. v. Cerullo Electric Supply Co.*, 32 F.R.D. 379, 381 (M.D.Pa. 1961).... *See also Aluminum Co. of America v. Essex Group, Inc.*, 499 F.Supp. 53, 59 (W.D.Pa.1980); *Lebeck v. William A. Jarvis, Inc.*, 145 F.Supp. 706, 726–27 (E.D.Pa.1956), *aff'd in part, rev'd in part on other grounds*, 250 F.2d 285 (3d Cir. 1957).

*In re Kaplan*, 1995 WL 500599 at * 4 (Bankr. E.D.Pa. Aug. 22, 1995). *See also In re Anderson*, 1994 WL 507527, at *7 n. 1 (Bankr.E.D.Pa. Sept. 14, 1994).

■ Since this court is a federal court which sits in Pennsylvania, we must apply the choice of law principles of Pennsylvania law to determine whether Pennsylvania or California substantive law applies to the parties' disputes. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996); *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir.1988); *Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.*, 626 F.2d 280, 283–84 (3d Cir.1980); *III Enterprises, supra*, 163 B.R. at 460; and *Kaplan, supra*, at *4. *See also Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 21–23, 203 A.2d 796, 805–06 (1964).

■ The Agreement involved in this case contains a choice of law provision, stating that it "shall be governed by, construed and enforced in accordance with" California law. *See* the Agreement, Art. 9, § 9.5. Since this

court must honor the parties' choice of law provisions, it must apply California substantive law to any claims arising out of the Agreement. *Aluminum Co. of America v. Essex Group, Inc.,* 499 F.Supp. 53, 59 (W.D.Pa.1980); *Admiral Corp. v. Cerullo Electric Supply Co.,* 32 F.R.D. 379, 381 (M.D.Pa.1961); *Lebeck v. William A. Jarvis, Inc.,* 145 F.Supp. 706, 726–27 (E.D.Pa.1956), *aff'd in part & rev'd in part on other grounds,* 250 F.2d 285 (3d Cir.1957); and *Kaplan, supra,* at \*4.

■ At the same time, however, a choice of law provision which is contained in a contract does not control claims which do not arise out of that contract. *See Kaplan,* at \*10, citing *T–Bill Option Club v. Brown & Co. Securities Corp.,* 23 F.3d 410, 1994 WL 201104, at \*3 (7th Cir.1994). Therefore, the choice of law provision contained in the Agreement does not apply to any claims involved in this litigation which do not arise out of that Agreement. Consequently, Pennsylvania conflicts of law provisions must be separately applied to determine whether Pennsylvania or California law should be applied to any claims which do not arise under the Agreement. *Id.*

■ Pennsylvania choice of law principles focus on the "center of gravity" of the transaction between the parties, *i.e.,* the state which has the most significant relationships with both the transactions in issue and with the parties, in order to determine which state's law must be applied to a particular dispute. *See In re Merritt Logan, Inc.,* 901 F.2d 349, 356 (3d Cir.1990); *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1211 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *In re DSC Industries,* 94 B.R. 42, 44 (E.D.Pa. 1988); *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.,* 607 F.Supp. 361, 367–68 (E.D.Pa.1985); *III Enterprises, supra,* 163 B.R. at 460; and *In re Lloyd Securities,* 1992 WL 318588, at \*6 (Bankr.E.D.Pa. Oct. 29, 1992). This test is sometimes called the "interest analysis/significant contacts" test. *See III Enterprises, supra,* 163 B.R. at 460; and *In re Windsor Communications Group, Inc.,* 80 B.R. 712, 722 (Bankr.E.D.Pa. 1987), *aff'd in part & vacated in part on*

*other grounds,* 96 B.R. 495 (E.D.Pa.1989), quoting *Jones & Laughlin, supra,* 626 F.2d at 283–84 and *Neville Chemical Co., supra,* 422 F.2d at 1210–11.

The leading Pennsylvania state court case on choice of law is *Griffith, supra. See Carrick v. Zurich–American Ins. Group,* 14 F.3d 907, 909 (3d Cir.1994); and *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991). In *Griffith* the Pennsylvania Supreme Court "abandoned the traditional *lex loci delicti* conflicts rule for 'a more flexible rule which analyzes of the policies and interests underlying the particular issue before the court.'" *Carrick, supra,* 14 F.3d at 909, quoting *Griffith, supra,* 416 Pa. at 21, 203 A.2d at 805. With regard to the flexibility of Pennsylvania's choice of law rule, the court stated that

> "this new conflicts methodology has evolved into a hybrid approach that 'combines the approaches of both Restatement II (contacts establishing significant relationships) and "interest analysis" (qualitative appraisal of relevant States' policies with respect to the controversy).'"

*Carrick, supra,* 14 F.3d at 909, quoting *Lacey, supra,* 932 F.2d at 187, which in turn quotes *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311 (3d Cir.1978).

The Pennsylvania Supreme Court has stated its choice of law rules in the following way:

(1) This Court in *Griffith v. United Air Lines, Inc.,* held that in resolving a potential conflict between the application of state laws we must consider the policies and interest underlying the particular issue before the court. *Id.* at 21, 203 A.2d at 805.

(2) As further explained in *McSwain v. McSwain,* 420 Pa. 86, 215 A.2d 677 (1966), we must analyze ... the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law.

(3) Furthermore, in evaluating the interests of one jurisdiction over another, we must view the factors qualitatively as op-

posed to quantitatively. *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970). *Myers v. Commercial Union Assurance Companies*, 506 Pa. 492, 495, 485 A.2d 1113, 1115 (1984). *See also Carrick, supra*, 14 F.3d at 910 (3d Cir.1994).

■■■ The Pennsylvania choice of law analysis has been described as a two-step process. *LeJeune, supra*, 85 F.3d at 1071. First, the court reviews the case to determine whether a "false conflict" exists. Then, if the court finds that no "false conflict" exists, the court will make a determination as to which of the conflicting states has the more significant interest in the application of its laws. *Id.; Lacey, supra*, 932 F.2d at 187 & n. 15; and *Cipolla, supra*, 439 Pa. at 565, 267 A.2d at 855, A "false conflict" occurs when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *LeJeune, supra*, 85 F.3d at 1071; and *Lacey, supra*, 932 F.2d at 187.

■■■ The RESTATEMENT OF CONFLICT OF LAWS (SECOND), § 6(2), at 10 (1971) ("the Restatement"), designates the factors which a court should consider when determining whether the law of the state of contracting, or another state, has the more significant relationship. *NL Industries, Inc. v. Commercial Union Insurance Co.*, 65 F.3d 314, 320 (3d Cir.1995); and *General Ceramics, Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 653 (3d Cir.1995). These factors are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.*, quoting the Restatement, § 6(2), at 10. Factors which a court applying the Pennsylvania choice of law principles will consider in making its determination regarding which state's law must be applied are (1) where the contract was made, and (2) where it was to be performed. *Rhodes v. Superior Investigative Services, Inc.*, 437 F.Supp. 1012, 1016 n. 2 (E.D.Pa.1977); *III Enterprises, supra*, 163 B.R. at 460; and *In re Danz' Estate*, 444 Pa. 411, 414, 283 A.2d 282, 284 (1971).

■■■ In this case the property owned by the Partnership is located in California. The administration of the Partnership by Ali occurred mostly in California. Finally, the Partnership was organized pursuant to California partnership law. On the other hand, none of the Answering Partners, nor any partners except Ali, lived in California nor spent any significant amount of time there during the life of the Partnership. In fact, most of the partners never set foot in California between 1986 and 1992.

As noted at the outset, we do not have to undergo the false conflicts analysis, nor apply the Restatement factors, nor any other factors regarding the Trustee's claims raised in this case because the Agreement contains a valid and enforceable choice of law provision governing all issues raised which are based on the Agreement. The substantive issues raised by the Trustee in this case concern matters which arose out of the Agreement, *i.e.*, the affirmative claims of breach of contract for failing to repay the negative capital accounts, distribution of the assets of the Partnership, repayment of the loans and interest thereon by the Partnership, repayment of advances to the Partnership, payment of commissions owed by the Partnership, and payment of accounting fees owed by the Partnership. Accordingly, California substantive law applies to the issues raised in the Proceeding by the Trustee.

However, statute of limitations defenses are raised by the Answering Partners. As to these defenses, Pennsylvania has the more significant contacts. Thus, as to these issues, we conclude that Pennsylvania law is controlling.

b. *All of the Trustee's Claims Except Those Asserted on Behalf of the Partnership Are Barred by the Applicable Pennsylvania Four-Year Limitation on These Claims.*

 Pursuant to Pennsylvania law, the statute of limitations for claims which accrue outside of the Commonwealth is the shorter of either the statute of limitations of the place where the claim accrued (California, in this case) or the period prescribed by Pennsylvania law itself. 42 Pa.C.S. § 5521(b); *In re TMI*, 89 F.3d 1106, 1116 (3d Cir.1996); *Unisys Finance Corp. v. U.S. Vision, Inc.*, 428 Pa.Super. 107, 109–112, 630 A.2d 55, 57 (1993), *appeal denied*, 538 Pa. 615, 645 A.2d 1318 (1994); and *Gwaltney v. Stone*, 387 Pa.Super. 492, 501, 564 A.2d 498, 503 (1989). Of course if the parties to a contract so choose, they can specifically stipulate in their contract which state's statute of limitations will apply to the causes of action arising under the contract. And, as we noted at pages 218–19 *supra*, the parties contracted to apply California substantive law to resolve any controversies.

 However, a *general* choice of law provision contained in contract does not govern the issue of the applicable statute of limitations because a choice of law provision does not pertain to the statute of limitations unless the provision expressly so states. *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179–80 (3d Cir.1992); and *Unisys, supra*, 428 Pa.Super. at 112, 630 A.2d at 58. *See also Des Brisay v. Goldfield Corp.*, 637 F.2d 680, 682 (9th Cir.1981). The choice of law clause contained in the Agreement at issue in this case is a general provision which does not specifically address applicable statutes of limitations. Therefore, as to the issue of the applicable statute of limitations, the law of Pennsylvania applies.

 In that regard, it has long been established in Pennsylvania that the law of the forum state "determines the time within which a cause of action shall be commenced." *Unisys, supra*, 428 Pa.Super. at 112, 630 A.2d at 58. *See also Ross v. Johns–Manville Corp.*, 766 F.2d 823, 826 (3d Cir.1985); *Cistone v. Ford Motor Co.*, 504 F.Supp. 328, 330 (E.D.Pa.1980); *Freeman v. Lawton*, 353 Pa. 613, 617, 46 A.2d 205, 206–07 (1946); and *Rosenzweig v. Heller*, 302 Pa. 279, 285, 153 A. 346, 348 (1931). There has been no change in this rule "despite the adoption of the significant contacts/interest analysis on substantive choice of law matters" by the Pennsylvania Supreme Court in *Griffith, supra*. *Unisys, supra*, 428 Pa.Super. at 112, 630 A.2d at 58. *See also Cistone, supra*, 504 F.Supp. at 330. Rather, we must look to Pennsylvania statutory law, *i.e.*, the borrowing statute at 42 Pa.C.S. § 5521, in order to determine which statute of limitations applies to this case. *Unisys, supra*, 428 Pa.Super. at 112, 630 A.2d at 58.

 The Pennsylvania statute of limitations for oral and written contractual agreements is four years. *See* 42 Pa.C.S. § 5525. The California statute of limitations for written contracts is four years, while the limitations period for oral contracts is two years. *See* Cal.C.C.P. §§ 337, 339. In addition, California courts have applied the four-year statute of limitations of § 343 of the California Code of Civil procedure to causes of action seeking an accounting from partners of a partnership based on a written partnership agreement. *Freeman v. Donohoe*, 65 Cal.App. 65, 81, 223 P. 431, 438 (1924). Finally, section 351 of the California Code of Civil Procedure provides an exception to these limitations periods when the party being sued was out of state when the cause of action accrued and remains out of state for a period of time. In that case, the statute of limitations is tolled until the defendant returns to California. *Id. See also Bayuk v. Edson*, 236 Cal.App.2d 309, 318, 46 Cal.Rptr. 49, 55 (1965).

 The Agreement at issue is a written contract. Since the Pennsylvania borrowing statute makes the applicable statute of limitations the shorter of the two states' statutes, and since both states prescribe a four-year limitations period for actions based upon written contracts, we can easily conclude that the Debtor, and the Trustee standing in his shoes, had four years from the date that his causes of action accrued within which to bring his actions based thereupon. We will not apply the California tolling statute, as the

222

Trustee contends is proper, because the four-year Pennsylvania statute of limitations without the tolling statute is the shorter of the two limitations periods and thus must be applied pursuant to the applicable Pennsylvania limitations law. The only remaining relevant inquiry is whether, and, if so, when the Debtor/Trustee's causes of action accrued.

■■■■ Most of the Counts of the Complaint, specifically much of Count One, and Counts Three through Seven, are claims for amounts allegedly owed to the Debtor under the Agreement. The principal claims are in fact for the amounts allegedly loaned by the Debtor to the Partnership and interest on those loans, and the others for amounts expended by the Debtor on behalf of the Partnership.

Even if we were to find that the transfers of funds from the Debtor to the Partnership were loans as opposed to capital contributions, *but see* pages 225–26 *infra*, California substantive law, which applies to fix when a claim accrues, holds that the statute of limitations on a loan commences to run from the date that the loan was made. Since the parties did not specify the time by which the loan was to be repaid, California courts presume that the loan is to be repaid on demand. *See Dorland v. Dorland,* 66 Cal. 189, 190, 5 P. 77, 78–79 (1884). California courts further hold that it is well settled that claims for money which are payable on demand accrue "with the inception of the obligation." *Miguel v. Miguel,* 184 Cal. 311, 314, 193 P. 935, 936 (1920); and *Estate of Galvin,* 51 Cal. 215, 217 (1876). In fact, in order for the court to find that the statute of limitations did not commence on the date that the loan was made, the Trustee was obliged to have produced some evidence in writing to that effect. *Id.* at 217, citing Cal.C.C.P. § 360. The transfer of funds from the Debtor's Meridian Bank account into the Partnership's Scripps Bank account occurred on January 25, 1990. Applying the four-year Pennsylvania statute of limitations, the statute of limitations ran as to these claims on January 25, 1994.

■■■ The Complaint alleges that the Debtor advanced the $5,000 to Riel on or around June 1, 1991. The commissions have

allegedly been owed to the Debtor since 1987. The accounting services were performed from 1986 through 1991, and the $2,500 sought in the Complaint has allegedly been on the books since 1989. It is apparent that the four-year statute of limitations ran as to all of these claims well prior to the institution of the Proceeding on April 16, 1996. We already noted that the Agreement states that F & A is to perform the accounting services in issue, not the Debtor. It therefore appears that the Debtor, individually, lacks standing to assert this claim. All of these claims are therefore barred.

c. *The Strictly Partnership Claims Have Not Yet Accrued, and We Lack Jurisdiction to Hear Them.*

■■■ Still remaining under consideration, as to the issue of timeliness, are the claims against the Defendants to make up the deficits in their respective Partnership capital accounts. The California Partnership Act and the California Corporations Code are applicable to determine the relationship among the partners of the Partnership. In addition, this court must also consider the terms of the Agreement in order to determine what the partners' rights and duties were in this case. *See Lewis v. Firestone,* 170 Cal.App.2d 129, 338 P.2d 953, 962 (1959).

■■■ However, while a partnership agreement may control the relationship of the partners to each other, "to the extent that their respective duties are not spelled out in an express agreement, the law imposes obligations arising out of the nature of their fiduciary relationship. One of these is the duty to account, as provided in Corporations Code sections 15021 and 15022." *Manok v. Fishman,* 31 Cal.App.3d 208, 213, 107 Cal. Rptr. 266, 270 (1973). When a partnership dissolves and has suffered a loss, the partners must contribute to the partnership's capital losses and to the partners' debt pursuant to Cal.C.C.P. §§ 15018(a), 15040(a), (b). *Goldstein v. Burstein,* 185 Cal.App.2d 725, 727–28, 8 Cal.Rptr. 574, 576. This is true in cases, such as that at hand, when the partnership agreement does not limit the amount of losses for which the partners can be liable

and no limitation is placed on the partners' liability. *Id.*

■ At the same time, however, the California Corporations Code, § 15043, provides that a partner's right to an account accrues to him or to his legal representative against his co-partners on the date of dissolution "in the absence of any agreement to the contrary." *See In re Peebles' Estate,* 27 Cal. App.3d 163, 166, 103 Cal.Rptr. 560, 562 (1972); and *Glassell v. Prentiss,* 175 Cal. App.2d 599, 606, 346 P.2d 895, 901 (1959). *Cf. Shearer v. Davis,* 67 Cal.App.2d 878, 881, 155 P.2d 708, 709 (1945) (involved joint venture). Other California decisional law has held that, in a case such as this, the statute of limitations does not begin to run until the partnership is dissolved *and* the accounts are settled, with the balance owed by the partners being established or agreed upon. *Green v. Kensinger,* 199 Kan. 220, 225, 429 P.2d 95, 99 (1967) (cites omitted) (applying California law); and *Freeman, supra,* 65 Cal. App. at 85, 223 P. at 439. Thus, it is clear that California decisional law is inconsistent on this issue.

■ California courts have consistently held, however, for over one hundred years, that generally a partner can not sue another partner on account of partnership transactions while the partnership is still in existence in an action at law, but rather must instead file a bill in equity for dissolution of the partnership and to obtain an accounting. *Security Pacific National Bank v. Lyons,* 25 Cal.App.4th 706, 711, 30 Cal.Rptr.2d 623, 626–27 (1994); *Prince v. Harting,* 177 Cal. App.2d 720, 732, 177 Cal.App.2d 720, 2 Cal. Rptr. 545, 552 (1960); *Barnstead v. Empire Mining Co.,* 5 Cal. 299 (1855); *Nugent v. Locke,* 4 Cal. 318, 320 (1854); *Stone v. Fouse,* 3 Cal. 292, 294 (1853); *Russell v. Byron,* 2 Cal. 86, 88 (1852); *Manok, supra,* 31 Cal. App.3d at 211, 107 Cal.Rptr. at 268; *Malott v. Seymour,* 101 Cal.App.2d 245, 246, 225 P.2d 310, 311, (1950) (additional citations omitted); and *Hall v. Hagerman,* 107 Cal. App.2d 523, 524–25, 237 P.2d 80, 81 (1951). The courts so hold because "it is ordinarily impossible to determine whether or not the defendant partner is in fact indebted to the plaintiff partner until the partnership ac-

counts are settled and the true standing of the parties has been ascertained." *Malott, supra,* 101 Cal.App.2d at 246–47, 225 P.2d at 311. *See also Prince, supra,* 177 Cal.App.2d at 733, 2 Cal.Rptr. at 552–53.

However, the courts have permitted a partner to maintain an action at law when the action involved that partner's suit against another partner for breach of the partnership agreement, when the action was for contribution after the partnership was already dissolved, and when the transaction in question can be segregated from other partnership matters, such as when a partner loans money to the partnership. *Id.*; and *Blee v. Lead Mountain,* 8 Cal.2d 550, 552, 66 P.2d 646, 646–47 (1937). This is consistent with our previous conclusion that the claims other than those regarding the Partnership accounts have accrued, and that, moreover, the limitations periods for these claims have run.

In addition, exceptions to the general rule precluding suits based on partnership accounts were noted in *Prince, supra,* and *Malott, supra.* In *Prince,* 177 Cal.App.2d at 734–35, 2 Cal.Rptr. at 553–54, the court noted numerous cases in which courts applied exceptions to the rule that partners are precluded from suing each other. In *Malott, supra,* 101 Cal.App.2d at 246, 225 P.2d at 311, the court determined that an exception to the general rule is permissible when statutory authority permits an action against co-partners.

■ The Agreement herein states that the Partnership will be deemed to have been dissolved "upon the . . . sale or other disposition by the Partnership of all or substantially all of its assets . . . ." Agreement, at ¶ 8.1.2. The foreclosure sales of each the four partnership properties definitely would constitute the "sale or other disposition" of all of the assets of the Partnership, since the only assets owned by the Partnership were the four properties in question. Accordingly, since three of the four partnership properties were either sold outright or in foreclosure sales by September 13, 1991, and the other was abandoned to foreclosure by trial date, this court will fix this date as the date upon which the

partnership was dissolved. Therefore, the fact that no evidence was presented at trial regarding when or if the final Draper Street property was actually foreclosed upon does not affect our decision, since the Agreement only requires the sale or other disposition of "substantially all" of the partnership assets, not the sale of all of the assets, and we are of the opinion that the sale of three out of the four partnership properties and abandonment of this fourth to foreclosure constitutes the sale of "substantially all" of the assets of the partnership.

We also note that Ali's departure is the equivalent of a withdrawal or attempted dissolution and that the Debtor filed the bankruptcy case in question, acts which constitute a dissolution pursuant to § 8.1.1 of the Partnership. *See* page 212 *supra.*

■ Accordingly, as to the claims for an accounting, we must follow the mandate of the California courts and hold that no claim has accrued, since an accounting has not yet been had, even though that the Partnership was dissolved for all intents and purposes in the fall of 1991. Since no action has yet accrued, there is no running of the statute of limitations, but there is also no claim which has accrued upon which the Debtor, and the Trustee in his stead, can make a claim.

The Trustee apparently recognizes this difficulty and appears to argue that this court should exercise its jurisdiction to effect the requisite accounting of the Partnership. Rubin expressly challenges this court's jurisdiction to accomplish such a purpose. The Trustee cites but one case, *In re Schlein,* 178 B.R. 82 (Bankr.E.D.Pa.1995), in support of its contention that we may properly exercise such jurisdiction.

*Schlein* was a Chapter 11 case, in which all of the interested parties agreed that the resolution of the debtor's interest in certain partnerships was "the predicate to any successful Chapter 11 reorganization." *Id.* at 83. Also, there was a consensus that a receiver of the partnerships had to be appointed by some court. *Id.* at 84. The only issue of dispute was whether the bankruptcy court or the state court of applicable jurisdiction should make the appointment of the receiver. *Id.*

In that case, the bankruptcy court accepted jurisdiction over the partnerships and appointed the receiver itself. *Id.* at 85–87. However, the court recognized that, even under these facts, the issue was "admittedly a close one," *id.* at 85, requiring the court to exercise the outer limits of its powers under 11 U.S.C. § 105(a).

■ The instant case is not a Chapter 11 reorganization. There is no plan of reorganization to be served by our exercise of jurisdiction. We also cannot close our eyes to the fact that, although the Trustee is the plaintiff and he undoubtedly agrees to such participation on the theory that there is no downside and he need exert little effort to possibly obtain assets for distribution and as a basis for his commissions, the reality is that the impetus for these claims is the Debtor. Moreover, it is the Debtor who admittedly had not disclosed his interests in the Partnership in timely fashion, prior to the initial closing of this case.

We are very reluctant to further extend the outer limits of our jurisdiction in such attenuated circumstances, driven by a debtor whose overall credibility is doubtful and whose capacity for assertion of doubtful claims troubles us. Under these circumstances, extension of our limited jurisdictional powers to effect an accounting of the nondebtor Partnership would be inappropriate. *See In re Clayton,* 1996 WL 537852 (Bankr.E.D.Pa. Sept. 17, 1996) (court refuses to extend its jurisdiction to litigate "successor in interest" issues relating to two nondebtor corporations of which a debtor and his wife were principals); and *In re Lease–A–Fleet, Inc.,* 141 B.R. 869 (Bankr.E.D.Pa.1992) (court refuses to allow consolidation, in a single case, of nondebtor entities with the financial affairs of the debtor).

We therefore decline the Trustee's invitation to act as the court through which the Partnership can pursue an accounting. We also note that this particular aspect of the Trustee's Complaint is particularly susceptible to a bar, at least in any federal court, on the basis of the terms of the dismissal of the Partnership Case agreed to by Zaid in 1994. *See* pages 226–27 *infra.*

As we noted at pages 217–18 *supra*, we question whether we have been presented sufficient credible evidence on which to render an accounting in any event. Since the claims for an accounting have not yet accrued, and we find that we lack jurisdiction to perform the accounting necessary to cause them to accrue now, we must dismiss these claims, and the Trustee's claims dependent on an adjudication on this issue, as untimely. All of the claims set forth in the Complaint are therefore barred by limitations or by the fact that the claims have not yet accrued.

3. *ANY ADVANCES TO THE PART-NERSHIP BY THE DEBTOR WERE PROPERLY CHARACTERIZED AS EQUITY CAPITAL TO THE PART-NERSHIP RATHER THAN LOANS.*

The Trustee alleges in his Complaint that the Debtor loaned money to the Partnership, which totalled $167,323.00, because the Partnership's rental income was not sufficient to pay for its debts and expenses. The Trustee further alleges that the Participating Partners knew or should have known about the loans to the Partnership based on the tax benefits which they all received. The Trustee then asserts in his post-trial brief that, even if this court determines that the transfer of funds were not loans, but rather were advances of capital to the partnership, the funds allegedly paid constituted obligations which are payable out of the Partnership's available cash under paragraph 3.4 of the Agreement, *see* pages 211–12 *supra*, and under §§ 15040(b)(II) and/or (III) of the California Corporations Code.

■ The Answering Partners contend, and this court finds, that the purported loans of the Debtor to the Partnership were in actuality capital contributions. The issue of loans versus capital contributions was explored by this court in *In re Union Meeting Partners*, 160 B.R. 757, 773–75 (Bankr. E.D.Pa.1993). There, we held that payments made to a debtor partnership by its general partners were equity investments rather than loans. *Id.* Specifically, we noted that the partnership's financial statements did not reflect a loan from the general partners. *Id.* at 774. The debtor partnership also failed to

produce any evidence that the transactions in question were loans to the partnership, *i.e.*, no loan agreements, proof of loan payments was produced, nor promissory notes were produced. *Id.* Finally, the debtor also did not list on its schedules the purported loans from the general partners as claims due and owing to the partners. *Id.* Thus, this court held that the money contributed was properly characterized as contributions of equity. *Id.*

In another case involving corporate insiders, the United States Supreme Court stated held that, since a director of a corporation is a fiduciary of that corporation, any dealings by the director with the corporation are subject to "rigorous scrutiny." *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939). *See also In re Comtec Industries, Inc.*, 91 B.R. 344, 347 (Bankr. E.D.Pa.1988). Thus, a director must prove that the transaction in question was undertaken in good faith and that it was inherently fair to the corporation. *Pepper, supra*, 308 U.S. at 306, 60 S.Ct. at 244–45; and *Comtec, supra*, 91 B.R. at 347. Consequently, the court held that "so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder." *Pepper, supra*, 308 U.S. at 309–10, 60 S.Ct. at 246. *See also Comtec, supra*, 91 B.R. at 347.

If any contributions made by the Debtor to the Partnership in this case were loans, they were not made at arms length, nor were they negotiated transactions. The Answering Partners' expert witness Denis opined, we think properly, that, from the aspect of accounting principles, these transactions must be considered as contributions of equity rather than as loans. Moreover, there is no evidence of when the loans were to be repaid, or if they were to be repaid at all. No loan agreements, no proof of loan payments, nor any promissory notes with regard to the $200,000 "loan" were produced at trial. As in *Union Meeting, supra*, the advances of money were originally carried on the Partnership's books as a capital contribution. Only later, after the dissolution of the Partnership, did the Partnership's books reflect

the transaction as a loan to the Partnership. In many respects, the Trustee's claim in this regard is weaker than the similar claim rejected by us in *Union Meeting*.

It must also be noted that, here, the Debtor was also serving as the accountant for the Partnership. Thus, the Partnership's books were mere bookkeeping entries made by the Debtor, in whose exclusive control the books were kept. The Debtor did not list the advances on his bankruptcy schedules as loans due to be repaid to him from the defendants. It is doubtful that a $200,000 account payable would be something that the average debtor would "forget" about. It seems rather clear, instead, that the Debtor, and the Trustee following him, are conveniently offering a revisionist theory of these transactions solely to support the claims set forth in the Proceeding.

With respect to the claims under § 3.4 of the Agreement, we note that § 3.4(a) provides for a payment priority only with respect to loans and advances pursuant to § 2.2 of the Agreement. Section 2.2 of the Agreement, quoted at page 211 *supra*, provides a specific procedure by which the Partnership's partners were authorized to make cash advances to the Partnership. First, a partner must refuse to contribute his share of additional capital to the Partnership. Second, the other partners must be ready and willing to contribute additional capital to the Partnership. Then and only then could a partner lend additional funds to the Partnership, which amount would not be considered to be capital contributed to the Partnership, but rather a debt due from the Partnership to the partner.

The Trustee, further, presented no evidence that the Participating Partners were aware of the shortfalls in the capital accounts, nor that a request was made from them to contribute additional capital to the Partnership prior to the Debtor's alleged transfer of additional funds to the Partnership, nor that any such request was refused by them. In fact, the transfer of funds from the Debtor's Meridian Bank account to the Partnership's Scripps Bank account occurred on January 25, 1990, long prior to the Partnership's difficulties coming to light in the summer of 1991. The Debtor's first letters to the Participating Partners and Rubin requesting capital contributions from them to cover the amount he advanced to the Partnership were dated October 23, 1991, and November 7, 1991. We therefore conclude that the Debtor did not have the authority to lend any money to the Partnership without first making requests for additional capital contributions which were refused by the other partners. Consequently, the Debtor acted in contravention of § 2.2 of the Agreement, and he had no rights, pursuant to § 3.4 of the Agreement, to any priority for any such advances to the Partnership.

Therefore, even if we were to conclude that the Trustee had been able to prove that the Debtor made advances to the Partnership in the amount claimed, and that any such claims were not barred by limitations, we would be compelled to dismiss any such claims as lacking substance due to their nonconformity with the terms of the Agreement and their proper classification as capital contributions rather than loans.

4. *THE DISMISSAL WITH PREJUDICE TO ANY FUTURE FEDERAL SUIT ADDRESSING THE SAME SUBJECT MATTER AS THE TRUSTEE'S CLAIM TO RECOVER ON THE NEGATIVE CAPITAL ACCOUNTS BARS THAT CLAIM IN THIS COURT.*

 The Answering Partners moved, prior to trial, to dismiss the Proceeding on the ground that the "substantive claims" asserted therein are the same as those which Zaid agreed, in his October 20, 1994, praecipe to dismiss the Partnership Case, that he would not pursue in "Federal Court" in the future. We note that, even had Zaid not expressly stated that the voluntary dismissal of the Partnership Case was "with prejudice" the dismissal might, under principles of *res judicata*, as qualified by the praecipe, bar a future action on the same claims in federal court. *See* Federal Rule of Bankruptcy Procedure 7041, incorporating Federal Rule of Civil Procedure 41(b); and *Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers*, 855 F.2d 1080, 1087 (3d

Cir.1988), citing *Kimmel v. Texas Commerce Bank,* 817 F.2d 39 (7th Cir.1987).

The responses of the Trustee are that the claims in the Partnership Case represented only a part of his claims in the Proceeding, that the parties only intended to reference the federal *district* court in the praecipe, and that he was not a party to the Partnership Case.

Of course, the Trustee was not a party to the Partnership Case, because, at that point in time, the Debtor had not yet chosen to activate him in this dispute. However, the instant federal bankruptcy court is clearly within the scope of a "Federal Court," and is in fact a unit of the district court. Further, a trustee is bound by the prior actions of a party to whose rights he succeeds. *See Armstrong v. Norwest Bank,* 964 F.2d 797, 801 (8th Cir.1992); *In re Lewis,* 157 B.R. 555, 560–61 (Bankr.E.D.Pa.1993); *In re Sherwood Ford, Inc.,* 125 B.R. 957, 961 (Bankr.D.Md.1991), *aff'd,* 1992 WL 295951 (D.Md. Sept. 17, 1992); and *In re American Int'l Airways, Inc.,* 75 B.R. 1023 (Bankr. E.D.Pa.1987). It therefore appears to us that Zaid's voluntary dismissal of the Partnership Case does indeed bar all of the substantive claims made in that Case which are substantially the same as those made by the Trustee in the Proceeding.

We do note, however, that the Partnership Case raised only the claims that the defendants should repay their negative capital accounts allegedly maintained with the Partnership. Thus, only part of Counts I and II are barred by the dismissal of the Partnership Case. These are, of course, the same or nearly the same claims over which we previously opined that we lacked jurisdiction. *See* pages 224–25 *supra.*

It is probably true that a revisit to bankruptcy court, via the Debtor's then soon-to-be-closed bankruptcy case, was probably the farthest thing from the mind of Zaid or any of the parties to the Partnership Case when they executed the dismissal praecipe. However, an unambiguous term of a contract (or an order) must be interpreted as it reads, irrespective of the parties' subjective intentions. *See In re St. Mary Hospital,* 101 B.R. 451, 461 (Bankr.E.D.Pa.1989). The praecipe

unambiguously bars a future action, such as the Proceeding, in this court.

5. *THE PROCEEDING ALSO MAY BE BARRED BY THE DOCTRINE OF JUDICIAL ESTOPPEL.*

The foregoing observations bring to mind the reason why no party contemplated a return to this bankruptcy court. That is because the Debtor had chosen not to disclose the claims now asserted in the Proceeding to the Trustee during the lengthy period between the filing of his bankruptcy case on March 30, 1992, and its initial closing on November 15, 1994. This fact leads us to observe that the Trustee's claims could conceivably also be barred by the doctrine of judicial estoppel, even though no party has raised the issue.

As the court explained in *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir.1996), judicial estoppel is a tool of the court, under applicable federal law principles, *id.,* which is utilized to prevent a party in a lawsuit from advancing a position which is inconsistent with a position that the party previously asserted in the same proceeding or in a prior proceeding. *See also, e.g., Cal–Almond, Inc. v. Dept. of Agriculture,* 67 F.3d 874, 880 (9th Cir.1995, *cert. denied,* —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); and *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). The doctrine was created to prevent parties from "playing 'fast and loose with the courts.'" *Ryan, supra,* 81 F.3d at 358, quoting *Scarano v. Central R.R.,* 203 F.2d 510, 513 (3d Cir.1953). *See also Rockwell International Corp. v. Hanford Atomic Metal Trades Council,* 851 F.2d 1208, 1210 (9th Cir.1988).

As the court recently held in *In re 815 Walnut Associates,* 183 B.R. 423, 431–32 (Bankr.E.D.Pa.1995), the doctrine of judicial estoppel can be applied against a party in a present lawsuit who was a party to a prior lawsuit *or* against a person who is in privity with the party to the prior lawsuit. In the instant Proceeding, it can easily be concluded

that the Debtor and the Trustee herein are in a relationship of privity with each other, and that the Trustee is thus bound by the Debtor's actions. *See* cases cited at pages 226–27 *supra*.

Thus, the Debtor's failure to list the debts owed to him by the Answering Partners arising out of the Agreement on his bankruptcy Schedules could easily be found to constitute a statement by the Debtor, binding on the Trustee, that he did not have any such claims. The Trustee's filing of the Proceeding is contrary to, and contradicts this assertion. *See e.g., Ryan, supra*, 81 F.3d at 361.

Similarly, in *Oneida, supra*, the court applied the doctrine of judicial estoppel because the debtor failed to disclose that it had the claim which it later attempted to assert against the creditor bank without even concluding that there was intentional conduct on behalf of the debtor. 848 F.2d at 417–18. In the instant circumstances, we are not prepared to find that the Debtor's nondisclosure did not amount to bad faith.

The Debtor's sudden, belated "disclosure" of his rights could easily be found to be an attempt to "play fast and loose" with this court by asserting different positions in the Proceeding than he asserted in his underlying bankruptcy case.

However, we recognize that "judicial estoppel is an 'extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in the miscarriage of justice.'" *Ryan, supra*, 81 F.3d at 365. We are also uncertain whether it is appropriate to raise this issue *sua sponte*. Since sufficient alternative grounds exist for dismissal of the Proceeding, we merely note this further alternative basis for this result.

## D. CONCLUSION

For all of the several alternative reasons cited herein, judgment will be entered against the Trustee as to all claims asserted in the Proceeding, and against the Defendants as to the third-party claims.

### ORDER

AND NOW, this 1st day of November, 1996, after the trial of the above-captioned proceeding on August 27, 1996, and September 4, 1996, and upon consideration of the parties' pre-trial and post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendants and against the Plaintiff, ARTHUR P. LIEBERSOHN, TRUSTEE ("the Trustee"), on all claims set forth in the Complaint.

2. Judgment is also entered in favor of the Third-party Defendants and against the Defendants on the Third-party Complaints asserted herein.

3. The Proceeding is therefore DISMISSED in its entirety.

4. Since litigation of the Proceeding was the sole basis for re-opening this bankruptcy case, the Clerk shall, pending any possible appeals, RE–CLOSE this case.